Jesse Prim, defendant-appellant, appeals from the judgment of the Cuyahoga County Court of Common Pleas, Criminal Division, Case No. CR-357925, in which defendant-appellant was convicted by a jury of aggravated murder, attempted murder, unlawful possession of a dangerous ordinance and having a weapon while under disability. In addition, defendant-appellant was convicted of attendant firearm specifications on the first three offenses. Defendant-appellant assigns six errors for this court's review.
Defendant-appellant's appeal is not well taken.
This case arises out of the murder of Tern Smith, a twenty-six year old woman, by defendant-appellant on December 5, 1997. On December 16, 1997, defendant-appellant was indicted by the Cuyahoga County Grand Jury in a four-count indictment on the following charges: aggravated murder, in violation of R.C.2903.01, with a firearm specification; attempted aggravated murder, in violation of R.C. 2923.02 and R.C. 2903.01, with a firearm specification; possession of a dangerous ordinance, in violation of R.C. 2923.17, with two firearm specifications; and having a weapon while under disability, in violation of R.C.2923.13. Defendant-appellant was arraigned on December 22, 1997, whereupon he entered a plea of not guilty to all counts contained within the indictment.
The trial court conducted a pre-trial hearing on February 3, 1998. At the hearing, defense counsel informed the trial court that, due to the serious nature of the charged offenses and the fact that discovery had not yet been completed, the earliest possible date that defense counsel could be prepared for trial was April 14, 1998. This presented a problem in light of the fact that, pursuant to R.C. 2945.71, defendant-appellant had to be brought to trial by March 4, 1998. The defendant-appellant refused to execute a waiver of speedy trial. The trial court then engaged defendant-appellant in a colloquy to determine if defendant-appellant understood the nature of the offenses with which he was charged and whether defendant-appellant understood the effect of refusing to waive speedy trial on defense counsel's ability to adequately represent defendant-appellant at trial on the underlying charges. At the conclusion of the pre-trial hearing, defendant-appellant maintained that he would not sign a waiver of his right to a speedy trial. Immediately thereafter, lead defense counsel was permitted to withdraw from the case.
On February 9, 1998, the trial court conducted a second pretrial hearing on this matter. Upon the state's motion, the trial court ordered that defendant-appellant be referred to the court psychiatric clinic pursuant to R.C. 2945.37 in order to determine whether defendant-appellant was competent to stand trial on the indicted offenses. Defense counsel objected to the trial court's order on the basis that defendant-appellant had given no indication that he was, in any way, incompetent. Trial was then scheduled for April 14, 1998. On February 11, 1998, defendant-appellant filed a motion to suppress statements.
On April 7, 1998, the trial court conducted a hearing on the competency report which had been completed by the psychiatric clinic on March 26, 1998. The psychiatric report concluded, in pertinent part, that defendant-appellant should undergo a period of observation and diagnostic evaluation as an inpatient in a psychiatric hospital in order to determine if defendant-appellant's religious beliefs were sincere or the product of mental illness. The trial court, after reading the pertinent parts of the psychiatric report into the record, questioned defendant-appellant as to whether he was working with his attorneys and understood his legal status. Defendant-appellant responded in the affirmative to both inquiries. Defense counsel concurred in defendant-appellant's assertions. At the conclusion of the hearing, the trial court determined that defendant-appellant was not in need of further psychiatric evaluation and was therefore competent to stand trial. The trial date was rescheduled for April 20, 1998.
On April 20, 1998, prior to commencement of trial, the trial court conducted an evidentiary hearing on defendant-appellant's motion to suppress. During the hearing, the state presented the testimony of three police officers, Lem Griffin, Eddy Rimer and Michael O'Malley. Each of these officers maintained that all of the statements made by defendant-appellant were either voluntarily provided or were made after defendant-appellant was given the Miranda warnings on three separate occasions by different police officers. Accordingly, the trial court denied defendant-appellant's motion to suppress.
A jury trial commenced immediately thereafter. The victim, Terri Smith, a twenty-six year old woman, lived on East 100th
Street in Cleveland, Ohio, near the Buckeye Road area with her mother, daughter and sister. Defendant-appellant lived in the same neighborhood. Defendant-appellant and Ms. Smith had been involved in an on again, off again relationship since 1996. During the relationship, defendant-appellant had apparently engaged in a number of harassing incidents involving Ms. Smith and her family including telephone harassment, repeatedly driving by Ms. Smith's residence and following Ms. Smith into a laundromat on Buckeye Road. Due to defendant-appellant's actions the Cleveland Police had to be called.
On December 5, 1997, Eloise Smith, the victim's mother, left the house at approximately 8:30 a.m. to go to work as an insurance salesperson. Upon arriving at work, Mrs. Smith realized that she had left her computer at home. Mrs. Smith paged Tern Smith, hoping that she would be able to bring the computer to her office. Tern informed her mother that she could, in fact, bring the computer. Mrs. Smith never received her computer that day.
Sometime after 9:00 a.m. that same day, Rashida Chambliss and Robin Hickman, two residents of East 99th Street, which runs between Elwell Avenue and Buckeye Road, heard gunshots followed by a woman screaming. Both women looked out the windows of their homes and observed Terri Smith running down the middle of the street toward Buckeye Road. Ms. Smith appeared hysterical and was screaming for help. Defendant-appellant was following behind Ms. Smith carrying a sawed-off shotgun at his side. It was later determined that Terri Smith had been shot in the right arm by defendant-appellant at the corner of East 99th Street and Elwell Avenue. A shotgun shell casing was eventually discovered at the scene of the shooting.
Ms. Smith proceeded to enter a laundromat located at the corner of Buckeye Road and East 100th Street screaming "he shot me, he shot me." Ms. Smith then moved to the back wall of the laundromat near a folding table. At this point, witnesses observed defendant-appellant enter the laundromat still carrying the sawed-off shotgun in his right arm. Defendant-appellant walked directly up to Ms. Smith, who was hysterically pleading for her life, braced himself and fired the shotgun striking Terri Smith in the head. Defendant-appellant then walked out of the laundromat in a casual manner still carrying the sawed-off shotgun. Defendant-appellant proceeded down Elwell Avenue where witnesses observed him pick up the victim's purse, place it in his automobile and walk away from the scene.
At approximately 9:56 a.m., Cleveland Police Officer Lem Griffin and his partner, in response to a radio broadcast detailing the shooting, were patrolling the area of East 99th
Street and Elwell Avenue when defendant-appellant stepped out into the street and flagged down the patrol car. At this point defendant-appellant stated "I'm the one your looking for." The officers asked defendant-appellant a number of questions to determine his identity and then asked defendant-appellant where the weapon was located. Defendant-appellant responded that he had hidden the weapon on Elwell Avenue. Defendant-appellant was patted down, taken into custody and placed in the back of the patrol car. During the search, the police discovered one live 16 gauge shotgun shell in defendant-appellant's possession. An additional search of the area near the laundromat uncovered empty 16 gauge shotgun shells near the corner of East 99th Street and Elwell Avenue.
After placing defendant-appellant in custody, the police officers drove to the area where defendant-appellant had stated that the gun was located. A brief search of the area failed to produce the subject weapon. At this point, Officer Eddy Rimer arrived on the scene to assist in the search. Officer Rimer entered the vehicle where defendant-appellant was located and, after reading defendant-appellant his Miranda warnings, asked defendant-appellant for the exact location of the weapon. Defendant-appellant indicated that he understood his rights due to prior involvement in the criminal justice system and then directed Officer Rimer to look under the front porch of the house next door to the house where the other police officers had been searching. Defendant-appellant allegedly stated further that he had shot Terri Smith because "he got tired of her fucking over him and taking his money." The shotgun was discovered soon after. Subsequent tests on the weapon demonstrated that it was operational and blood on the gun itself was found to be consistent with that of the victim, Terri Smith.
Defendant-appellant was then transported by police cruiser to St. Luke's Hospital for treatment on his right wrist which he maintained he had injured while shooting Terri Smith. At the hospital, defendant-appellant reiterated that he had shot Terri Smith because he was tired of seeing her with other men and due to the on again, off again nature of their relationship. Defendant-appellant stated further that he had been to church a number of weeks prior to the shooting and related a biblical passage regarding a season or a time for everything. Defendant-appellant maintained that he realized it was time for him to do what he had to do, apparently referring to the murder of Terri Smith. Defendant-appellant stated further, on the morning of December 5, 1997, he saw the victim and she requested that he give her a ride. Defendant-appellant maintained he was unable to do so at that time. The victim then proceeded to ask another male friend who was sitting nearby in his car. Defendant-appellant stated that he observed this exchange and became angry to the point of wanting to kill both the victim and her male friend. The male friend in question, however, left the scene before defendant-appellant could act on his impulse. Defendant-appellant stated that he then followed Terri Smith into the laundromat, looked her in the eyes and shot her. Defendant-appellant left the laundromat, walked back toward his car and eventually hid the shotgun at a nearby house before surrendering to police.
Approximately six hours after shooting Terri Smith, defendant-appellant was interviewed by Detective Michael O'Malley of the Cleveland Police Homicide Unit. Defendant-appellant told Detective O'Malley that the victim had been stealing money from him on a number of occasions. On the day of the shooting, defendant-appellant and Terri Smith had an argument while driving in defendant-appellant's automobile. Defendant-appellant stopped the vehicle and Ms. Smith got out. Defendant-appellant then stated that he shot the victim in the arm one time. Ms. Smith began to run down the street and defendant-appellant chased her into the laundromat. At this point, defendant-appellant maintained that both he and Ms. Smith were holding the shotgun when it fired, striking Terri Smith in the head. A second shot was fired as Ms. Smith fell to the floor.
A subsequent autopsy revealed that Terri Smith died as a result of a gunshot wound to the head. Ms. Smith was also found to have a large shotgun wound on her right forearm. Shotgun pellets were discovered in Ms. Smith's hands, arm and head.
At the conclusion of the trial, defense counsel requested that the trial court instruct the jury on the offenses of voluntary manslaughter. The trial court refused to instruct the jury as requested and submitted the case to the jury as indicted.
On April 24, 1998, the jury returned a guilty verdict as to the offenses of aggravated murder, attempted murder, having a weapon while under disability and unlawful possession of a dangerous ordinance. Defendant-appellant was also found guilty of attendant firearm specifications on the first three counts of the indictment. On April 27, 1998, the trial court sentenced defendant-appellant to life imprisonment with parole eligibility after twenty years on the offense of aggravated murder with three additional years for the firearm specification, merged count two with count one, sentenced defendant-appellant to one year on the offense of having a weapon while under disability, and one year on the offenses of unlawful possession of a dangerous ordinance. All sentences were ordered to be served consecutively.
On May 18, 1998, defendant-appellant filed a timely notice of appeal from his convictions in the trial court.
Defendant-appellant's first assignment of error states:
 I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY REFUSING TO INSTRUCT THE JURY AS TO VOLUNTARY MANSLAUGHTER.
Defendant-appellant argues, through his first assignment of error, that the trial court improperly refused to instruct the jury on a lesser offense of voluntary manslaughter. Specifically, defendant-appellant maintains that the evidence presented, when viewed in a light most favorable to the defense, warranted such an instruction in light of the fact that the shooting occurred after a heated argument with the victim during which she was allegedly taunting and humiliating defendant-appellant causing him to become frantically enraged. It is defendant-appellant's position that the evidence demonstrated that the shooting occurred while he was under the influence of sudden passion and in a sudden fit of rage brought about by the victim herself and, therefore, the requested instruction was in fact appropriate under the circumstances.
R.C. 2903.03, which sets forth the elements of the offenses of voluntary manslaughter and distinguishes it from murder, states:
 No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.
Therefore, an instruction on voluntary manslaughter is warranted only when the evidence, when viewed in a light most favorable to the defendant, would allow the finder of fact to reasonably conclude that the defendant established, by a preponderance of the evidence, that he acted under the influence of sudden passion or a fit of rage brought on by serious provocation by the victim that is reasonably sufficient to incite the use of deadly force. State v. Rhodes (1992), 63 Ohio St.3d 613,617-618, 590 N.E.2d 261. When considering such an instruction, both an objective and subjective test must be established. State v. Shane (1992), 63 Ohio St.3d 630, 634-635,590 N.E.2d 272. First, the provocation must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control. Id. at 635, 590 N.E.2d 272. Second, if that objective test is met, the defendant must show that in this particular case he was actually under the influence of sudden passion or in a sudden fit of rage. Id. at 634, 590 N.E.2d 272; see, generally, State v. Thomas (Mar. 26, 1996), Franklin App. No. 95APA08-984, unreported. In determining whether this subjective test has been satisfied, the emotional and mental state of the defendant, as well as the conditions and circumstances that surrounded the incident in question, must be considered. It is the defendant's burden to persuade the fact-finder, by a preponderance of the evidence, that the requisite mitigating circumstances existed to reduce his crime from aggravated murder or murder to voluntary manslaughter. Statev. Varner (Oct. 29, 1997), Summit App. No. 18198, unreported, citing State v. Rhodes, supra.
In the case sub judice, a review of the evidence demonstrates that the trial court did not err in failing to instruct the jury on the lesser offense of voluntary manslaughter. Eyewitnesses to the shooting described defendant-appellant as calm and deliberate throughout the entire incident. After the shooting, defendant-appellant purposely walked from the laundromat, picked up the victim's purse and placed it in his vehicle before eventually hiding the murder weapon under the porch of a nearby residence. After the arrest, the police officers described defendant-appellant as calm and somewhat remorseful. Defendant-appellant's own statements to the police reveal an individual who felt that he had just accomplished an act which had to be done, referring to biblical passages in support of his reasoning. In addition, the largely uncontested version of the shooting presented at trial does not demonstrate sudden passion or a sudden fit of rage, but rather, a calculated act by defendant-appellant whereby he shot the victim once in the arm, pursued her into a public building and shot her in the head at point blank range. Accordingly, it is apparent from the record that an instruction on voluntary manslaughter was unsupported by the evidence presented and the trial court did not err by refusing to give such an instruction to the jury. See State v.Harris (Aug. 25, 1998), Franklin App. No. 97APA11-1506, unreported.
For the foregoing reasons, defendant-appellant's first assignment of error is not well taken.
Defendant-appellant's second assignment of error states:
 II. THE TRIAL COURT COMMITTED PLAIN ERROR BY DENYING APPELLANT'S MOTION TO SUPPRESS STATEMENTS.
Defendant-appellant argues, through his second assignment of error, that the trial court erred by overruling his motion to suppress statements. Specifically, defendant-appellant argues that the police officers questioned him concerning the location of the murder weapon and its identifying characteristics prior to advising him of his Miranda rights while defendant-appellant was handcuffed and sitting in the back seat of a police cruiser. It is defendant-appellant's position that the questioning was clearly coercive under the circumstances and the statement as well as the weapon itself should have been excluded from the evidence as fruit of the poisonous tree pursuant to Wong Sun v.United States (1963), 371 U.S. 471.
In a motion to suppress, the trial court assumes the role of trier of fact, and as such, is in the best position to resolve questions of fact and evaluate witness credibility. See State v.Mills (1992), 62 Ohio St.3d 357, 366, citing State v. Fanning
(1982), 1 Ohio St.3d 19, 20. Therefore, upon review of a suppression ruling, an appellate court is bound to accept the trial court's findings if they are supported by competent, credible evidence. State v. Guysinger (1993), 86 Ohio App.3d 592,594. Accepting those facts as true, the appellate court must independently determine, as a matter of law, without deference to the decision of the trial court, whether the lower court met the applicable legal standard. State v. Klein (1991), 73 Ohio App.3d 486,488; State v. Breech (June 7, 1994), Pike App. No. 93CA517, unreported.
The Fifth Amendment to the United States Constitution provides that no person shall be compelled to be a witness against himself.
Thus, prior to any custodial interrogation, a person must be warned that he has a right to remain silent, that any statement he does make may be used against him, and that he has the right to the presence of retained or appointed counsel during questioning. Miranda v. Arizona (1966), 384 U.S. 436, 444. These rights may be waived, provided such waiver is made voluntarily, knowingly and intelligently. Id. See, also, Michigan v. Tucker
(1974), 417 U.S. 433, 444. It is well settled that the state carries the burden of demonstrating a valid waiver of Miranda rights by a preponderance of the evidence. See Tague v. Louisiana
(1980), 444 U.S. 469, 471; North Carolina v. Butler (1979),441 U.S. 369, 373.
In New York v. Quarles (1984), 467 U.S. 649, the United States Supreme Court set forth a public safety exception to the Miranda requirement. In limited instances, the Court concluded that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. at 657. The public safety exception does not apply to all situations in which a suspect is believed to have used a weapon in the commission of a crime and does not permit police officers to ask questions which are not necessary to secure their safety or that of the public at large. In order to establish the need for the exception, the state must demonstrate that 1) there was an objectively reasonable need to protect the police or the public, 2) from an immediate danger, 3) associated with a weapon, and that 4) the questions asked were related to that danger and reasonably necessary to secure public safety. This analysis is to be conducted on a case by case basis.State v. Jergens (Sept. 3, 1993), Montgomery App. No. 13294, unreported.
In the case herein, a review of the disputed statements demonstrates that some were clearly self-initiated and all were voluntary. Defendant-appellant came into contact with the police only after flagging down a patrol car and advising the officers that he was the suspect they were looking for in connection with the recent shooting in the area. At this point, the officers asked defendant-appellant about the exact whereabouts of the murder weapon. One of the officers on the scene testified that this was done out of the fear that the gun would be discovered by children in the neighborhood as there was a school located nearby and it was still early in the day. Clearly, the record contains evidence of an objectively reasonable need to protect the public from immediate danger associated with the weapon as required by the Supreme Court in Quarles. Accordingly, the trial court did not err by overruling defendant-appellant's motion to suppress. It is also significant to note that, from the time the police discovered the murder weapon, defendant-appellant was Mirandized on three separate occasions and expressed an unusual willingness to speak to the police about the nature and the details of the crime and his motivations in spite of the repeated Miranda warnings by the police.
Defendant-appellant's second assignment of error is not well taken.
Defendant-appellant's third assignment of error states:
 III. THE TRIAL COURT COMMITTED PLAIN ERROR IN PERMITTING THE INTRODUCTION AND REPEATED REFERENCE TO THE VICTIM AS GRUESOME (SIC).
Defendant-appellant maintains that the trial court improperly allowed graphic photographs of the victim, her wounds and the crime scene into evidence. It is defendant-appellant's position that these photographs merely served to prejudice the jury and their prejudicial effect violated his constitutional right to due process and a fair trial.
It is well established that the admission of photographic evidence is left to the sound discretion of the trial court.State v. Jackson (1991), 57 Ohio St.3d 29. In State v. Mauer
(1985), 15 Ohio St.3d 239, 473 N.E.2d 768, the Ohio Supreme Court stated at paragraph seven of the syllabus:
 Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony or other evidence, as long as the danger of material prejudice to the defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number.
Accordingly, reviewing courts should be slow to interfere with a trial court's determination concerning the admissibility of evidence unless the court has clearly abused its discretion and the concerned party has been materially prejudiced thereby.Maurer, supra, at 265, 473 N.E.2d 768; State v. Awkal (1996),76 Ohio St.3d 324.
In the instant case, a review of the record demonstrates that the photographs of the victim and the crime scene in general, while admittedly graphic, serve to illustrate the testimony of a number of prosecution witnesses as to how the crime most probably occurred and as to the location of the victim's body as seen by the eyewitnesses and the police upon their arrival. Similarly, the autopsy photographs illustrate the wounds to the victim and support the testimony of the deputy coroner and the other forensic witnesses. Clearly, the admission of the photographs in question was neither repetitive nor cumulative in nature. Therefore, since the photographs served to illustrate the testimony set forth by the state and the photographs themselves were relevant to the very nature of the underlying offenses, the trial court did not abuse its discretion in admitting the disputed photographs and defendant-appellant was not denied his constitutional rights by their admission into evidence. State v.Frazier (1995), 99 Ohio App.3d 1; State v. Dixon (Mar. 13, 1997), Cuyahoga App. No. 68338, unreported.
Defendant-appellant's third assignment of error is not well taken.
Defendant-appellant's fourth assignment of error states:
 IV. THE TRIAL COURT ABUSED ITS DISCRETION BY CIRCUMVENTING THE SPEEDY TRIAL PROVISIONS CONTAINED IN O.R.C. 2945.71 WHERE IT ORDERED A COMPETENCY REFERRAL OVER THE APPELLANT'S AND DEFENSE COUNSEL'S OBJECTION.
Defendant-appellant argues, through his fourth assignment of error, that the trial court improperly referred him to the court psychiatric clinic for a competency and sanity evaluation after defendant-appellant refused to sign a waiver of speedy trial to allow his counsel to adequately prepare for trial in this matter. Defendant-appellant maintains that the trial court's referral was merely a pretext to avoid the expiration of the statutory time within which he had to be brought to trial pursuant to R.C.2945.71.
The Sixth and Fourteenth Amendments to the United States Constitution, as well as Section 10, Article I of the Ohio Constitution, guarantee a criminal defendant the right to a speedy trial by the state. State v. O'Brien (1987), 34 Ohio St.3d 7,516 N.E.2d 218. In Barker v. Wingo (1972), 407 U.S. 514, 523,92 S.Ct. 2182, 2188, 33 L.Ed.2d 101, 112-113, the United States Supreme Court declared that, with regard to fixing a time frame for speedy trials, "the states are free to prescribe reasonable standards to that end, the Ohio General Assembly enacted R.C.2945.71 in order to comply with the Barker decision. See, also,State v. Lewis (1990), 70 Ohio App.3d 624, 591 N.E.2d 854.
R.C. 2945.71 states in pertinent part:
 (C) A person against whom a charge of felony is pending:
 (1) Notwithstanding any provisions to the contrary in Criminal Rule 5(B), shall be accorded a preliminary hearing within fifteen consecutive days after his arrest if the accused is not held in jail in lieu of bail on the pending charge or within ten consecutive days after his arrest if the accused is held in jail in lieu of bail on the pending charge;
 (2) Shall be brought to trial within two hundred seventy days after his arrest.
* * *
 (E) For purposes of computing time under divisions (A), (B), (C)(2), and (D) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days. This division does not apply for purposes of computing time under division (C)(1) of this section.
It is well established that the Ohio speedy trial statute constitutes a rational effort to enforce the constitutional right to a public speedy trial of an accused charged with the commission of a felony or a misdemeanor and shall be strictly enforced by the courts of this state. State v. Pachey (1980),64 Ohio St.2d 218, 416 N.E.2d 589. Once the statutory limit has expired, the defendant has established a prima facie case for dismissal. State v. Howard (1992), 79 Ohio App.3d 705,607 N.E.2d 1121. At that point, the burden shifts to the state to demonstrate that sufficient time was tolled pursuant to R.C.2945.72. State v. Geraldo (1983), 13 Ohio App.3d 27,468 N.E.2d 328. It is also well established that the period during which the mental competency of the accused to stand trial is being determined tolls the time in which the accused must be brought to trial. R.C. 2945.72(B). See State v. Bowman (1987), 41 Ohio App.3d 318,535 N.E.2d 730; State v. Wilson (1982), 7 Ohio App.3d 219,454 N.E.2d 1348; State v. Saddler (April 16, 1998), Cuyahoga App. No. 71447, unreported.
The decision by a trial court to refer a defendant to the psychiatric clinic for a competency evaluation is reviewed under an abuse of discretion standard. Saddler, supra. An abuse of discretion connotes more than an error in law or judgment, it implies that the attitude of the trial court is unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151,404 N.E.2d 144; State v. Qualls (1988), 50 Ohio App.3d 56,552 N.E.2d 957.
In the case sub judice, a review of the record demonstrates that the trial court did not abuse its discretion by referring defendant-appellant to the court psychiatric clinic for a competency and sanity evaluation. The trial court conducted two pre-trial hearings on this matter during which defense counsel and the trial court attempted to explain to defendant-appellant the necessity of executing a waiver of speedy trial and why such a waiver would be in defendant-appellant's best interest. In fact, one of defendant-appellant's trial counsel who was experienced in murder prosecutions was forced to withdraw from the case due to defendant-appellant's refusal to waive speedy trial as he would not have sufficient time to adequately prepare the defense. Even after this transpired, defendant-appellant still refused to waive his speedy trial time. This unexplained refusal combined with defendant-appellant's assertions that he had killed the victim after reading a biblical passage that had somehow inspired the murder clearly support the trial court's decision to refer defendant-appellant for a psychiatric evaluation.
Defendant-appellant's fourth assignment of error is not well taken.
Defendant-appellant's fifth assignment of error states:
 V. THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Defendant-appellant argues that the jury verdict in this matter was not supported by the manifest weight of the evidence. Specifically, defendant-appellant maintains that the manifest weight of the evidence does not support the conclusion that defendant-appellant killed the victim with prior calculation and design.
State v. Martin (1983), 20 Ohio App.3d 172, has set forth the proper test to be utilized when addressing the issue of manifest weight of the evidence. The Martin court stated:
 There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here, the test is much broader. The court, reviewing the entire record, weighs the evidence and all the reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. * * * See Tibbs v. Florida (1982), 457 U.S. 31, 38, 42.
Article IV, Section 3(B)(3) of the Ohio Constitution authorizes appellate courts to assess the weight of the evidence independently of the fact-finder. Thus, when a claim is assigned concerning the manifest weight of the evidence, an appellate court "has the authority and the duty to weigh the evidence and determine whether the findings of "the trier of fact were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial." State ex rel. Squire v. Cityof Cleveland (1948), 150 Ohio St. 303, 345.
The standard employed when reviewing a claim based upon the weight of the evidence is not the same standard used when considering a claim based upon the sufficiency of the evidence. The United States Supreme Court recognized these distinctions inTibbs v. Florida (1982), 457 U.S. 31, where it determined that unlike a reversal based upon insufficiency of the evidence, an appellate court's disagreement with the jurors' weighing of the evidence does not require special deference accorded verdicts of acquittal; i.e., invocation of the double jeopardy clause as a bar to re-litigation. Id. at 43. Additionally, only a concurring majority of an appellate panel is needed to reverse a judgment based upon the sufficiency of the evidence as opposed to the unanimous concurrence of all three appellate judges in a jury trial necessary for a reversal based upon the manifest weight of the evidence. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
An appellate court does not and cannot sit as the "thirteenth juror" when reviewing a claim based upon the weight of the evidence. Rather, we must accord due deference to the credibility determinations made by the trier of fact. See State v. DeHass,
supra. As this court has previously stated in State v. Thompson
(April 23, 1998), Cuyahoga App. No. 72044, unreported:
 The fact-finder, being the jury (in the case) or the trial judge (in a waiver), occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witnesses and the examiner, and watch the witness's reaction to exhibits and the like. Determining credibility from a sterile transcript is a herculean endeavor.
The essential elements of the offense of aggravated murder pursuant to R.C. 2903.01 are that a person (1) purposefully, (2) with prior calculation and design, (3) causes the death of another. In the case herein, defendant-appellant essentially argues that the evidence presented failed to establish that he had killed Ms. Smith with prior calculation and design. It is defendant-appellant's position that the evidence actually demonstrated that the killing was the result of a sudden and heated argument after which he shot the victim while still under the influence of rage brought about by the confrontation. A thorough review of the evidence fails to support defendant-appellant's assertion. Initially, it should be noted that defendant-appellant apparently thought about killing Ms. Smith at least one week prior to the actual event as demonstrated by defendant-appellant's admission to the police that he had contemplated the act after reading a biblical passage. Then, on the actual day of the murder, defendant-appellant had a loaded sawed-off shotgun in his vehicle, shot the victim once in the arm, calmly pursued the victim for a city block, and killed her in a local business establishment with a shotgun blast to her head after she had been pleading with him to spare her life. Clearly, the elements of aggravated murder, including prior calculation and design, have been established by the prosecution. Since the weight to be given the evidence and the credibility of the witnesses are primarily matters for the finder of fact to determine and since it is not the function of the appellate court to substitute its judgment for that of the fact-finder, State v.Grant (1993), 67 Ohio St.3d 465; State v. D'Ambrosio (1993),67 Ohio St.3d 185, this court cannot now say that the underlying jury verdict in this case is against the manifest weight of the evidence. The evidence viewed in its entirety does not demonstrate that the jury lost its way and created a manifest miscarriage of justice by finding defendant-appellant guilty of acting with prior calculation and design in ending the life of Terri Smith. See State v. Hopson (April 8, 1999), Cuyahoga App. No. 73309, unreported.
Defendant-appellant's fifth assignment of error is not well taken.
Defendant-appellant's sixth and final assignment of error states:
 VI. APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.
Defendant-appellant argues, through his sixth and final assignment of error, that he was denied his constitutional right to effective assistance of counsel. Specifically, defendant-appellant maintains that he should have been permitted to testify in his own behalf during trial and that his testimony was his "only hope of success at trial" to obtain a conviction of murder or voluntary manslaughter rather than aggravated murder.
In order to substantiate a claim of ineffective assistance of counsel, the appellant is required to demonstrate that: 1) the performance of defense counsel was seriously flawed and deficient; and 2) the result of the appellant's trial or legal proceeding would have been different had defense counsel provided proper representation. Strickland v. Washington (1984),466 U.S. 668, State v. Brooks (1986), 25 Ohio St.3d 144.
In reviewing a claim of ineffective assistance of counsel, it must be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner. State v. Smith
(1985), 17 Ohio St.3d 98; Vaughn v. Maxwell (1965), 2 Ohio St.2d 299.
The Supreme Court of Ohio, with regard to the issue of ineffective assistance of counsel, held in State v. Bradley
(1989), 42 Ohio St.3d 136, that:
 "When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights we reviolated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." State v. Lytle (1976), 48 Ohio St.2d 391, 396-397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated in part on other grounds (1978), 438 U.S. 910. This standard is essentially the same as the one enunciated by the United States Supreme Court in Strickland v. Washington (1984), 466 U.S. 668.
 Even assuming that counsel's performance was ineffective, this is not sufficient to warrant reversal of a conviction. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Cf. United States v. Morrison, 449 U.S. 361, 364-365 (1981)." Strickland, supra, at 691. To warrant reversal, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra, at 694. In adopting this standard, it is important to note that the court specifically rejected lesser standards for demonstrating prejudice. * * *.
 Accordingly, to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.
State v. Bradley, supra, at 141, 142.
In the case sub judice, a review of the entire record from the trial court fails to demonstrate any evidence that defendant-appellant's trial counsel committed errors or represented defendant-appellant in a manner that fell below an objective standard of reasonableness. Defendant-appellant's counsel thoroughly examined all state's witnesses and attempted to raise evidentiary questions as to their respective version of the events at issue. In addition, at no time did defendant-appellant express any desire on the record to testify in his own behalf. Defense counsel's failure to call defendant-appellant to testify was clearly a tactical decision based upon defendant-appellant's prior statements to police and other relevant factors for which this court will not find that a constitutional deprivation of the right to effective assistance of counsel occurred. See State v. Hogan (June 8, 1995), Cuyahoga App. No. 66956, unreported.
Defendant-appellant's sixth and final assignment of error is not well taken.
Judgment of the trial court is affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KARPINSKI, P.J. and KILBANE, J., CONCUR.
 __________________________________ MICHAEL J. CORRIGAN JUDGE