**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1206-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

V.D.W.,

     Defendant-Appellant.

_____

Argued May 8, 2025 – Decided June 10, 2025

Before Judges Natali and Vinci.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 23-09-0622.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Dinaz Akhtar, Assistant Deputy Public Defender and Stefan Van Jura, of counsel and on the briefs).

Narline Casimir, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Elizabeth Vogelsong-Parvin, Acting

Gloucester County Prosecutor, attorney; Narline Casimir, of counsel and on the briefs).

PER CURIAM

By leave granted, defendant V.D.W.[1] appeals from a November 21, 2024 order, granting in part and denying in part, a motion to suppress his statements to the police and evidence found in his car as a result of a warrantless search. We reverse.

## I.

In July 2023, a Gloucester County grand jury charged defendant with three counts of second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b)(1); two counts of third-degree unlawful possession of rifles and shotguns, N.J.S.A. 2C:39-5(c)(1); and fourth-degree possession of hollow nose bullets, N.J.S.A. 2C:39-3(f)(1). Defendant filed a motion to suppress, and the court held a testimonial hearing. The following facts were developed at that hearing.

On April 22, 2022, Patrolman Joshua Graham, a then-member of the Paulsboro Police Department, and Patrolman Vincent DiGiacomo responded to a residence, which was the alleged scene of a domestic violence incident. At

---

[1] We utilize initials to protect victims or alleged victims of domestic violence. R. 1:38-3(c)(12).

the scene, Patrolman Graham spoke with defendant's mother, who claimed defendant discharged a firearm in the house while she was asleep, which resulted in a verbal fight that turned physical.

Defendant's mother further stated defendant was intoxicated and left the home after the fight in a 2013 to 2017 blue Dodge Charger registered in Pennsylvania. She further explained defendant owned firearms registered to him in Pennsylvania. A search of the residence by Patrolman Graham resulted in the retrieval of a shell casing from the kitchen garbage can. He was unable, however, to locate any bullet holes in the residence.

As Patrolman Graham was returning to his car, he observed a Dodge Charger similar to the description given by defendant's mother pull into the parking lot, which he confirmed was registered to defendant. After defendant exited the vehicle, Patrolman Graham immediately ordered him to put his hands in the air, searched his waistband, conducted a pat down, and placed defendant in handcuffs. The search of defendant did not reveal any weapons.

The following questioning of defendant ensued:

> [PATROLMAN GRAHAM]: Is there anything in this car that we need to know about?
>
> DEFENDANT: I have a gun.

A-1206-24

[PATROLMAN GRAHAM]:  Where is that at?  Where is that at?

Defendant did not answer Patrolman Graham's question, and he proceeded to ask defendant questions about his license to carry a firearm in Pennsylvania. Patrolman Graham testified he did not administer <u>Miranda</u>[2] warnings because he "believed that it was exigent that [he] locate the handgun as quickly and safely as possible."

Defendant eventually disclosed that the gun was "in [his] bag" and later specified it was "in the front seat."  Patrolman DiGiacomo proceeded to search defendant's car for the gun but was unsuccessful, despite defendant's instructions.  Defendant also mentioned the gun may still be in his mother's home after Patrolman DiGiacomo did not find the gun where defendant believed he left it.  Eventually, the officers seized:  a loaded magazine from the front seat; a duffle bag containing two handguns and a disconnected rifle with multiple loaded magazines from the back seat; ammunition including hollow nose rounds; and a large black container containing a shotgun with a loaded magazine.

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-1206-24

At the suppression hearing, defendant's counsel asked Patrolman Graham about his intentions to obtain a warrant or impound defendant's vehicle:

> [DEFENSE COUNSEL]:  At no point when you [were] searching and bringing everything out of [defendant's] car . . . , at no point did you . . . think about getting a telephonic warrant, correct?
>
> [PATROLMAN GRAHAM]:  No[,] we did not.
>
> [DEFENSE COUNSEL]:  Okay.  At no point was it your intention to even impound the car, correct?
>
> [PATROLMAN GRAHAM]:  Not at the time, no.

The court issued a written decision, which as noted, granted in part and denied in part, defendant's application.  With respect to the statement "I have a gun," the court concluded defendant, although in custody, was not subject to a custodial interrogation under the public safety exception as "[c]ase law has established that public safety is a sufficient basis on which to delay administering <u>Miranda</u> warnings."  Based on the facts known to the officers at the time, i.e., that defendant possibly left his mother's home with a firearm he discharged in the house, the court explained it was "plausible" Patrolman Graham's question, "[i]s there anything in this car that we need to know about?" "was directed towards protecting the safety of [the officers] and the public" and not intended to elicit an "incriminating response."  The court concluded,

however, "continued questioning of . . . defendant" and the statements elicited therefrom, were not admissible under the public safety exception to Miranda.

With respect to the physical evidence seized, the court concluded the search failed to satisfy either the public safety or search incident to arrest exceptions to the warrant requirement. However, it found the "inevitable discovery doctrine [was] an adequate basis to deny suppression of the evidence seized from [d]efendant's vehicle."

Under the public safety exception, the court found the absence of any exigency. The court explained defendant could not access his gun because he was handcuffed outside the car; the facts did not indicate an accomplice or co-conspirator; there were no observers present; and, given that "[t]he events took place around . . . 3:00 [a.m.] and 4:00 [a.m.]," the officers "could have searched the surrounding area for several hours without interference from or concerns for bystanders." The court further found the search incident to arrest exception was inapplicable because "there was no danger that [defendant] could have reached any potential weapons in the vehicle or that he could have destroyed any evidence in the vehicle."

The court concluded the inevitable discovery exception applied, however, because the "parties . . . agreed th[e] responding officers were aware that

6

[d]efendant was likely in possession of a firearm," and "[w]ith that knowledge, the officers would have attempted to find th[e] firearm." Based on defendant's statement that his gun was in the car, the court concluded the officers would "search the car for the gun, either by exigency or by warrant," and that "[t]he State . . . presented sufficient evidence that the next logical step would be to search [d]efendant's vehicle for the firearm, after none were found on his person."

The court further concluded the officers "would have impounded [d]efendant's vehicle and obtained a warrant to search it, leading to the inevitable discovery of [d]efendant's firearms" and that defendant's initial statement was "icing on the cake" because "probable cause existed to search the car even without [defendant's] statement." It did "not find exigency to support law enforcement[']s actions . . . , [and] the next reasonable and logical investigative step would [have] be[en] to impound the car and secure a search warrant." The court noted the incident occurred on a Friday, and any warrant drafted would not have been reviewed by a judge until normal business hours, which the court found further supported the likelihood that the officers would have impounded the car.

A-1206-24

On appeal, defendant raises the following arguments for our consideration:[3]

POINT I

THE TRIAL COURT ERRED IN DENYING . . . DEFENDANT'S MOTION TO SUPPRESS EVIDENCE WHERE POLICE FLAGRANTLY VIOLATED [DEFENDANT]'S FOURTH AMENDMENT RIGHTS[,] AND THE INEVITABLE DOCTRINE DOES NOT APPLY; THE DOCTRINE IS A NARROW EXCEPTON THAT IMPOSES A HIGH BURDEN OF PROOF ON THE STATE; [THE] STATE DID NOT SHOW BY CLEAR AND CONVINCING EVIDENCE THAT THE EVIDENCE WOULD HAVE INEVITABLY BEEN DISCOVERED IF NOT FOR THE UNLAWFUL SEARCH.

    A. THE TRIAL COURT ERRED IN APPLYING THE INEVITABLE DISCOVERY DOCTRINE TO THIS CASE; APPLYING THE TRIAL COURT'S REASONING UNIVERSALLY, IN EVERY CASE THE POLICE HAD PROBABLE CAUSE[,] THEY WOULD NOT NEED TO GET A WARRANT AND INSTEAD HANG THEIR HAT ON THE INEVITABLE DISCOVERY DOCTRINE.

        1. The State Did Not Establish That Police Would Have Inevitably Discovered The Evidence Through An Inventory Search.

---

[3] We have reconstituted defendant's point headings to remove arguments related to the standards for interlocutory review.

8

2. The State Did Not Establish That Police Would Have Inevitably Discovered The Evidence By Obtaining A Search Warrant.

POINT II

THE COURT ERRED IN FAILING TO SUPPRESS DEFENDANT'S INITIAL CUSTODIAL STATEMENT WHERE POLICE UNCONSCIONABLY AND FLAGRANTLY VIOLATED [DEFENDANT]'S MIRANDA RIGHTS

A. Defendant's Miranda Rights and Fruit of the Poisonous Tree.

In defendant's supplemental brief, he raises the following additional points for our consideration:

POINT I

THE TRIAL COURT ERRED IN FINDING THAT THE SAFETY EXCEPTION TO MIRANDA APPLIED HERE BECAUSE: A) THERE WAS NO OBJECTIVELY REASONABLE NEED TO PROTECT THE POLICE OR THE PUBLIC FROM IMMEDIATE DANGER ASSOCIATED WITH A WEAPON; AND B) THE POLICE GENERALLY QUESTIONED DEFENDANT ABOUT "ANYTHING [THEY] NEED[ED] TO KNOW ABOUT," NOT POSING A NARROWLY FRAMED QUESTION ABOUT THE POSSIBLE PRESENCE OF A WEAPON.

POINT II

THE EVIDENCE FOUND IN THE CAR SHOULD BE SUPPRESSED BECAUSE, CONTRARY TO THE

9

TRIAL COURT'S RULING, THE STATE HAS NOT MET ITS BURDEN UNDER THE INEVITABLE DISCOVERY DOCTRINE.

## II.

Our scope of review of a trial court's decision on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021) (citing State v. Robinson, 200 N.J. 1, 15 (2009)). Generally, "a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). "We ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)) (internal quotation marks omitted). However, the legal conclusions to be drawn from those facts are reviewed de novo. State v. Hubbard, 222 N.J. 249, 263 (2015) (citing State v. Gandhi, 201 N.J. 161, 176 (2010)).

## III.

A. Public Safety Exception

Defendant argues the court should have suppressed his initial statement, "I have a gun," because he was subject to a custodial interrogation and the "court incorrectly ruled . . . [this] statement . . . was lawfully obtained pursuant to the [public] safety exception of Miranda." In support, defendant notes the trial court found he was in custody at the time he made his initial statement, as he presented sufficient evidence to show he was not free to leave. He further argues "the police were not presented with an objective and immediate safety concern that would excuse dispensing with Miranda's protections." Defendant also maintains there was insufficient evidence to show a gun was fired inside the house.

With respect to the public safety exception, defendant contends the "court erred when it found . . . the questioning was motivated by the public and officer safety concerns" because the "court itself pronounced that even though finding the gun was necessary, danger to the public was not looming." In support of this contention, defendant explains he was in handcuffs, did not have any weapons on his person, "no longer had access to the vehicle and any gun therein," and there were multiple officers present.

Defendant adds the court's reasoning incorrectly "focused on the officer's subjective intent in questioning defendant, not on objective circumstances informing whether the officers had a reasonable belief in an imminent danger

11

from a weapon."  He argues, instead, "[j]udicial precedent is well-established that the intentions behind [an] officer's questioning determine[] whether [a question] is interrogatory in nature" and further explains the "Miranda context" is "certainly . . . not one of" the "very few . . . circumstances in which we look to an officer's subjective intent."

Defendant further maintains the court erred in finding the "circumstances presented an immediate danger from a gun."  First, he contends the search conducted inside the home was "a cursory search for a bullet hole [that] provide[d] no confidence whatsoever that the handgun was not left behind when defendant left the home."  Second, even if defendant left the home with the gun, there was no "legitimate concern for the officers' safety" because defendant was immediately handcuffed and patted down, and did not have any weapons in his immediate possession.  And third, "there was no objective reason to believe that—if defendant did leave the home with the handgun—he abandoned it where it posed a risk to the public."  Defendant contends it is more likely the gun would have been found in his car, easily secured by the officers, which coupled with the time of day, "remov[ed] any need to question defendant without the proper Miranda warnings."

12

Assuming there was an objectively reasonable need to protect the officers or the public from the gun, defendant argues Patrolman Graham's question "exceeded the bounds of the safety exception." Relying on our Supreme Court's decision in State v. O'Neal, 190 N.J. 601, 618 (2007), which held a question must be narrowly tailored to determine the existence of a weapon or protect safety, defendant maintains that the question "is there anything in the car we need to know about" could be directed at the "entire universe of incriminating evidence that could be in the car that would not pose a concern to officer safety." We agree with defendant and reject the court's conclusion the public safety exception applied to his statement, "I have a gun."

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In Miranda, the United States Supreme Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically triggering the Fifth Amendment privilege against self-incrimination." State v. P.Z., 152 N.J. 86, 102 (1997) (citing Miranda, 384 U.S. at 436).

A-1206-24

As a result, "when a person in police custody is questioned by law enforcement, [they] must be told that [they have] the right to remain silent, that any statement [they] make[] may be used against [them], that [they have] the right to an attorney, and that if [they] cannot afford an attorney, one will be provided for [them]." Ibid. (citing Miranda, 384 U.S. at 444). These procedural safeguards, commonly referred to as "Miranda warnings," ibid., are intended "to secure the privilege against self-incrimination" and are required whenever custodial interrogation occurs. Miranda, 384 U.S. at 444.

"The public safety exception to the requirement of giving a Miranda warning prior to interrogation was first recognized by the United States Supreme Court in New York v. Quarles, 467 U.S. 649 (1984)." State v. Melendez, 423 N.J. Super. 1, 23 (App. Div. 2011) (citation reformatted). The core principle supporting the public safety exception is that the exigency of a threat to safety outweighs the need for the "prophylactic" benefit of Miranda. Quarles, 467 U.S. at 657. Thus, "[t]his exception allows police to question an accused, prior to giving Miranda warnings, when there is a public safety concern." Melendez, 423 N.J. Super. at 23 (citing Quarles, 467 U.S. at 657).

"Our Supreme Court adopted the public safety exception in . . . O'Neal[,] holding that the questioning of a suspect prior to the administration of Miranda

warnings was acceptable when the situations presented an 'objectively reasonable need to protect the police or the public from any immediate danger associated' with a weapon." Id. at 23-24 (quoting O'Neal, 190 N.J. at 618). In State v. Stephenson, we delineated a framework to determine whether the public safety exception applied to a given situation, explaining:

> There must be a compelling and exigent need, under the totality of the circumstances, to protect the police or the public. In order to establish the need to invoke the exception, the State must generally demonstrate "(1) there was an objectively reasonable need to protect the police or the public; (2) from an immediate danger; (3) associated with a weapon; and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety."
>
> [350 N.J. Super. 517, 525 (App. Div. 2002) (quoting State v. Prim, 730 N.E.2d 455, 463 (8th Dist. 1999)).]

We warned that "the exception should be narrowly construed" because "[t]o sanction unwarned questioning about the presence or whereabouts of a gun in every case where a gun is suspected would result in the exception swallowing the rule." Ibid. We acknowledged that while "[t]he discarded gun in Quarles was reasonably believed to be in a public place," the Court's "rationale [did] not require this factor." Id. at 527. Instead, it "fashioned the exception to deal with 'a kaleidoscopic situation . . . where spontaneity rather than adherence to a police manual is necessarily the order of the day,' where it is necessary for the

15

police to 'neutralize the volatile situation confronting them.'" Id. at 528 (omission in original) (quoting Quarles, 467 U.S. at 656, 658).

We explained:

> In the totality of any particular set of circumstances, a missing gun in a private location, such as a home, apartment or motel room might pose the requisite danger to the police or public to justify the exception. However, to the extent that public safety is implicated, the gun must be reasonably believed to be in an unknown location (even if private) which is accessible to third parties and not reasonably capable of being secured. It is the overall circumstances, not merely the location, therefore, that controls.
>
> [Id. at 527-28.]

The Stephenson court rejected the State's arguments with respect to the public safety exception where officers responded to a call from a woman claiming an individual threatened to shoot her son during an argument on the phone. Id. at 520. The call was traced to a motel, where the victim identified the defendant and corroborated the threat. Ibid. Police found the defendant alone in his motel room. Ibid. When asked by an officer "if he had any weapons," the defendant responded "[n]ot on me." Id. at 521. After searching the defendant, the officer asked where the gun was, and handcuffed the defendant when he did not answer. Ibid.

Without advising the defendant of his Miranda rights, the officer told the defendant if he did not disclose the location of the gun, he would obtain a search warrant for the room. Ibid. Eventually, the defendant "gestured with his head towards the dresser," "stated the gun was in the drawer in a blue bag," and described the gun to the police. Ibid. We concluded:

> The factual complex before us does not support a finding of a volatile situation contemplated by Quarles[,] which required immediate police inquiry to defuse a potential threat to the public safety. Once [the] defendant was handcuffed, . . . there was no basis to find an immediate danger to the police, and the record contains no evidence of any immediate danger to the public. We therefore hold that under these circumstances[,] the public safety exception does not apply.
>
> [Id. at 530.]

Here, as a threshold matter, we note the parties do not contest the court's conclusion that defendant was in custody for Miranda purposes when he made the initial statement, "I have a gun," in response to Patrolman Graham's question concerning the contents of his vehicle. Therefore, the only outstanding issue on this point is whether the court erred when it found the public safety exception to Miranda prevents the suppression of defendant's statement. We conclude it did.

As noted, the public safety exception allows officers to, in limited circumstances, forego providing a defendant Miranda warnings when there is an

"objectively reasonable need to protect the police or the public from any immediate danger." Melendez, 423 N.J. Super. at 23 (quoting O'Neal, 190 N.J. at 618). Here, no such danger existed. Patrolman Graham, upon identifying defendant's car and observing defendant exit the vehicle, immediately searched defendant and placed him in handcuffs. The search did not reveal any weapons, nor did defendant, while handcuffed, have the physical capability to retrieve a weapon to endanger the police or public. Thus, as stated in Stephenson, "[o]nce defendant was handcuffed, . . . there was no basis to find an immediate danger to the police." 350 N.J. Super. at 530.

Further, under Stephenson, a weapon in an unknown location, even a private location, must be accessible to third parties and not reasonably capable of being secured. Id. at 528. At the time Patrolman Graham questioned defendant, it was unclear to the officers whether the gun was still in the home, as the record reflects the search inside the home was focused on finding a bullet hole, whether the gun was in defendant's car, or whether the gun was in another unknown location.

With respect to defendant's vehicle, it was unreasonable to conclude the weapon could have been accessed by a third party. The testimony established defendant arrived in the early morning hours, and there were no bystanders or

18

observers. Additionally, because the events occurred in close proximity to defendant's car, the police presence further prevented any would-be third party from accessing the vehicle. The record further established there were no weapons in plain view from outside the vehicle, and the officers had access to the keys.

Much like the motel room in Stephenson, defendant's mother's home could have been easily secured by the officers, and the record lacks any evidence to suggest defendant might have discarded a weapon in an unknown public location prior to the eventual search of his vehicle. Patrolman Graham's initial question was a general question about the contents of the car, not an inquiry about the location of the gun. Thus, we are convinced the court erred in denying defendant's application to suppress his statement "I have a gun" under the public safety exception.

The substance of Patrolman Graham's question, "is there anything in this car we need to know about?," we agree with defendant the question was overbroad. As noted in O'Neal, "the police must specifically frame the question to elicit a response concerning the possible presence of a weapon." 190 N.J. at 618. The O'Neal court concluded the officer's question "what's this?" when inquiring about a bulge in the defendant's sock was not sufficiently narrow to

19

invoke the exception.  Ibid.  Patrolman Graham's similarly broad question here is likewise improper.  The question was in no way tailored to determining the presence of a weapon and, instead, invited defendant to disclose any of the contents of his vehicle that might be of concern to law enforcement.

B.   Inevitable Discovery

Defendant next argues the court erred in denying his motion to suppress the physical evidence seized from his car because the search was presumptively invalid, as it was conducted without a warrant and "the State did not show that the evidence would have been inevitably discovered as they did not show that police would have impounded nor sought and obtained a search warrant for [d]efendant's vehicle."  First, defendant contends "[t]he State utterly failed to meet its burden to show that it would have impounded the vehicle and conducted an inventory search . . . had it not unlawfully discovered the evidence."  Second, defendant maintains the State did not establish the "police would have inevitably discovered the evidence through a warrant-authorized search of the vehicle."

With respect to the inventory search, defendant argues the "court erred in deciding the State had met [its] heavy burden[,] as the record does not indicate, let alone clearly and convincingly[] show[,] that the officers would have impounded the vehicle and" conducted an inventory search.  Instead, defendant

notes Patrolman Graham's testimony explicitly stated law enforcement did not intend to impound the car, and therefore, the "court's ruling that the officers would have impounded the vehicle and obtained a warrant to search it is clearly erroneous." Additionally, defendant asserts Patrolman Graham "did not testify about any polices or procedures of the Paulsboro Police Department regarding inventory searches, nor did he point to certain aspects of th[e] case that would support a conclusion that police would have inventoried the vehicle."

In light of these arguments, defendant maintains the State failed to establish that "proper, normal, and specific investigatory procedures would have been pursued" as required by the first prong of our Supreme Court's test established in State v. Sugar (Sugar II), 100 N.J. 214, 238 (1985). Additionally, again relying on Sugar II, defendant asserts applying the inevitable discovery doctrine would put "the State in a better position than it would have enjoyed had it seized the guns in a lawful manner." Thus, he claims "there is an absence of a factual record demonstrating that the vehicle would have been impounded and that an inventory search would have been conducted."

"With respect to whether police would have inevitably discovered the evidence through a warrant-authorized search of the vehicle," defendant argues "the State failed to satisfy either prong one or prong two of the Sugar II test."

21

Under prong one, the "proper, normal, and specific investigatory procedure[]" prong, defendant contends "there is simply no evidence in the record to indicate that police would have sought a warrant to search [his] vehicle had they not already found contraband inside" because "the State failed to elicit any testimony from [Patrolman] Graham[] as to what steps they would have taken had they not discovered the guns through an illegal search." Instead, defendant notes the body worn camera footage lacks any discussion of applying for a warrant, and Patrolman Graham testified the officers did not intend to obtain a warrant.

As to prong two of the Sugar II test, which requires "under all [of] the surrounding relevant circumstances the pursuit of [the investigatory procedures detailed under prong one] would have inevitably resulted in the discovery of the evidence," defendant argues without his tainted statement, "I have a gun," a warrant to search the car would not have been issued as probable cause did not exist. Based on defendant's contentions that there was insufficient evidence to prove he fired a gun in the house, he maintains the officers "did not have probable cause that the gun was in the vehicle." Instead, defendant maintains "the police had some reasonable level of belief that the car contained a

22

gun . . . [b]ut that belief only arose to probable cause when defendant said that the gun was in his car, which was elicited in violation of Miranda."

Defendant further claims he told the officers at some point that his "gun was back at the residence," which further shows the officers did not have probable cause that the gun was in the vehicle. Thus, defendant contends the "factual record is devoid of any testimony with regards to [the] State's decision to procure a warrant"; "the State presented insufficient evidence to show that the police would have sought a search warrant"; and "the State . . . failed to show that a valid warrant would have issued without the unlawful search." We conclude the court erred in finding the inevitable discovery doctrine applied to the evidence seized as the result of a warrantless search of his vehicle.

"The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in almost identical language, protect against unreasonable searches and seizures." State v. Nyema, 249 N.J. 509, 527 (2022). Warrantless searches are presumptively invalid because they are contrary to the United States and the New Jersey Constitutions, State v. Pineiro, 181 N.J. 13, 19 (2009), and "[t]he warrant requirement . . . may be dispensed with in only a few narrowly circumscribed exceptions," State v. Patino, 83 N.J. 1, 7 (1980). "To justify a warrantless search or seizure, 'the State

bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023) (alteration in original) (quoting State v. Chisum, 236 N.J. 530, 546 (2019)).

The inevitable discovery doctrine may be invoked to "preserve—if certain conditions are satisfied—the admissibility of evidence obtained without a warrant or a valid exception to the warrant requirement." State v. Camey, 239 N.J. 282, 301 (2019). The doctrine is an exception to the exclusionary rule and permits the admission of unlawfully obtained evidence "when . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct," thereby negating any taint. State v. Sugar (Sugar III), 108 N.J. 151, 156 (1987) (omission in original) (Nix v. Williams, 467 U.S. 431, 448 (1984)). The rationale underlying the doctrine is that:

> the deterrent purposes of the exclusionary rule are not served by excluding evidence that, but for the misconduct, the police inevitably would have discovered. If the evidence would have been obtained lawfully and properly without the misconduct, exclusion of the evidence would put the prosecution in a worse position than if no illegality had transpired.
>
> [Sugar II, 100 N.J. at 237.]

24

To rely on the inevitable discovery doctrine, the State must establish by clear and convincing evidence the following:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances[,] the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [State v. Shaw, 237 N.J. 588, 621 (2019) (quoting State v. Smith, 212 N.J. 365, 391 (2012)).]

The State is not required to show "the exact circumstances of the evidence's discovery" or "the exclusive path leading to the discovery." Sugar III, 108 N.J. at 158. "Rather, '[t]he State need only present facts or elements—proving each such fact or element by a preponderance of the evidence—that in combination clearly and convincingly establish the ultimate fact and lead to the conclusion that the evidence would be inevitably discovered.'" Camey, 239 N.J. at 302 (alteration in original) (quoting Sugar III, 108 N.J. at 159). The State can meet its burden by showing inevitable discovery would have occurred "in one or in several ways," based on the totality of "the evidence understood in light of ordinary experience and common sense." Sugar III, 108 N.J. at 159, 163.

25

We are satisfied the inevitable discovery doctrine did not justify the warrantless search of defendant's vehicle because the State failed to provide the foundational testimony or other evidence at the suppression hearing necessary to establish the evidence seized from defendant's vehicle would have been discovered through a subsequent inventory search or through a warrant-authorized search. The court's findings with respect to the investigatory procedures the officers would have followed to seize the weapons from defendant's car lack support in the record. In fact, Patrolman Graham testified that at no point during the search did the officers intend to obtain a telephonic warrant to search defendant's vehicle. He further stated they similarly had no intention to impound the car at any point during the search. Therefore, the State cannot establish the first prong of the Sugar II test, as the record does not reflect that the officers would have pursued "proper, normal and specific investigatory procedures," and the court's findings on this issue are contrary to Patrolman Graham's testimony. See 100 N.J. at 238.

To the extent we have not otherwise addressed defendant's arguments, it is because we have concluded they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hawley

Clerk of the Appellate Division

A-1206-24