30 A.3d 320 (2011)
423 N.J. Super. 1
STATE of New Jersey, Plaintiff-Respondent,
v.
George R. MELENDEZ, Defendant-Appellant.
Docket No. A-0640-08T4
Superior Court of New Jersey, Appellate Division.
Argued November 10, 2010.
Decided October 26, 2011.
*322 Stephen P. Hunter, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, *323 attorney; Mr. Hunter, of counsel and on the brief).
Paula Jordao, Assistant Prosecutor, argued the cause for respondent (Robert A. Bianchi, Morris County Prosecutor, attorney; Ms. Jordao, on the brief).
Before Judges FUENTES, GILROY and ASHRAFI.
The opinion of the court was delivered by
FUENTES, J.A.D.
Defendant George Melendez was tried before a jury and convicted of murder, N.J.S.A. 2C:11-3(a)(1) and (2), second degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), and third degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). The court sentenced defendant to an aggregate term of life imprisonment, with an eighty-five percent period of parole ineligibility and five years parole supervision pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.
The principal question raised by defendant in this appeal concerns the admissibility of inculpatory statements he gave in response to a police officer's questions, while he was in custody and after he had invoked his right to counsel. These statements led the police to the location where defendant had discarded the handgun he used to kill his wife. Relying on the public safety exception first articulated by the United States Supreme Court in New York v. Quarles, 467 U.S. 649, 655-56, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550, 557 (1984), the trial court found the interrogating officer was authorized to question defendant to discover the location of the discarded and presumably loaded handgun. Alternatively, the court found defendant voluntarily and knowingly waived his right to counsel at the time he decided to answer questions posed to him by different officers.
We affirm. Although the circumstances surrounding the missing handgun did not provide a valid basis to invoke the public safety exception under Quarles, the record supports the trial court's finding that defendant voluntarily and knowingly waived his right to remain silent, independent of the initial questions concerning the location of the weapon.

I
We derive the following facts from the record developed before the trial court.

A

The Arrest
On the morning of October 11, 2003, Rockaway Township Police Officer Christopher Hulsman was briefed by his shift commander that a woman had been found dead from gunshot wounds outside of the Rockaway Townsquare Mall. The crime occurred two days earlier, on October 9, 2003. An arrest warrant had been issued for defendant, the victim's husband, for violation of a domestic violence restraining order and for questioning in connection with his wife's death. Hulsman left the briefing a little after 6:00 a.m. in a marked police car and in full uniform.
At approximately 10:00 a.m., Hulsman was patrolling on Mount Hope Road, a heavily wooded area near Mount Hope Pond, when he saw a man (later identified as defendant) walking on the side of the road with a slight limp and his head down. As Hulsman drove past, defendant lifted his head, looked in Hulsman's direction, and continued walking towards the center of the road. Concluding defendant may have been trying to get his attention, Hulsman backed up the police car and asked: "Are you okay?" According to Hulsman, *324 defendant replied: "I think you're looking for me." Defendant then "held out both arms in front of him with his fists clenched as if he was looking to be handcuffed."
Hulsman testified that defendant was wearing a green coat with the words "Royal Lawns" written on one side, and the name "George" on the other. After reporting the encounter to police headquarters, Hulsman showed defendant a photograph of himself and asked him: "Is that you?" to which defendant answered: "Yes." The back of the photograph read: "Suspected, armed and dangerous." Hulsman ordered defendant to put his hands on top of the patrol car, patted him down, and asked him if "he had any guns or weapons or anything else on him." According to Hulsman, defendant replied: "[I] got rid of the gun."
Hulsman handcuffed defendant, placed him in the back of the patrol car, and read him his rights under Miranda.[1] When Hulsman asked him if he understood his rights, defendant answered "yes," and said: "[I] think [I] need to talk to an attorney." Hulsman did not have any further conversation with defendant from this point on. He called the police station to request backup and informed Captain James Sazack that he had defendant in custody.
Officers Michael Herda and Robert Sherr were two of the backup officers who reported to the scene of defendant's arrest. Hulsman testified that Herda saw something sticking out of defendant's pocket and asked defendant to step out of the police car so that he could be searched. When Herda began reading defendant his rights under Miranda, Hulsman intervened and advised Herda that he had already apprised defendant of his rights. Although Hulsman saw Herda continue to speak with defendant thereafter, he did not hear the content of the conversation. Hulsman also informed the detectives from the Rockaway Township Police Department and investigators from the Morris County Prosecutor's Office that defendant had been informed of his rights under Miranda and had requested an attorney.
Although Herda acknowledged that Hulsman told him he had read defendant his rights under Miranda, Herda testified Hulsman did not tell him that defendant had invoked his right to have counsel present before answering any questions. Herda asked defendant if he understood his rights under Miranda, to which defendant responded: "Yes." Herda then removed what appeared to be legal papers from defendant's pockets.
At this point, despite the fact that defendant had been previously searched and was handcuffed, Herda asked defendant if he had a weapon on his person. When defendant answered: "No," Herda asked defendant if he had any weapons on his person before Hulsman stopped him. Defendant answered: "[Y]eah, but I don't have it now." Defendant further asked Herda: "Do you think I need any attorney?" As to this key question, Herda testified as follows:
A. My answer to him was that he was entitled to an attorney. I was just concerned because the area that people go up there fish, kids, hike, that if the gun wasif there was a gun and it was in that area, somebody could get hurt.
Q. Okay. Now, in responsedid the defendant respond to that statement at all?
A. Yes, he did.
Q. What did he say?
A. He stated or he said yes, it was somewhere in the area.

*325 Q. Okay. Did he dowhen you asked that question, did he do anything, did he make any gestures?
A. Yeah, I asked him where, and he motioned with his head up towards like north end of Mount Hope Road, of Mount Hope Pond.
Q. And that's inis that in the direction of the pond that we're speaking of?
A. Yes, sir.
....
Q. Now, [who] utilizes that cabin?
A. It's a Rockaway Township Sportsmen cabin, and the Boy Scouts use it, and the Rockaway Township Sportsmen.
Q. Now, is it only used for a certain period of time during the year?
A. I believe is open year round.
Q. Okay. In your experience as a police officer, obviously, you've been a police officer 22-and-a-half years, have you seen that cabin being used all year round?
A. Yes, sir.
Q. Now, did he give youdid he give you a specific statement with respect to where the gun would be?
A. He stated that it was in the woods somewhere near a rock pile.
Q. Okay. And he didn't get anymore specific than that?
A. No.
Herda also asked defendant about his health and whether he was taking any medications. Defendant told Herda that his leg was hurting him and that he suffers from arthritis in his leg and arm. According to Herda, defendant had not taken his medication for the past four days, and had been walking around the area since the day before his arrest. Herda did not ask defendant: (1) to describe the kind of medication defendant was taking; (2) to identify the illness or condition the medication was intended to treat; or (3) to explain the reasons for not taking his medication for over four days.

B

Interrogation at Police Station
Captain Jeffrey S. Paul of the Morris County Prosecutor's Officer was assigned to investigate the death at the Rockaway Townsquare Mall. He reported to the Rockaway Township Police Station on the day of defendant's arrest and was informed that defendant "had mentioned the issue in regards to an attorney" and was also told that defendant had been limping and may be injured. After discussing the matter with the Chief of Investigations, Paul was instructed to determine whether defendant needed medical attention.
Based on this directive, Paul approached defendant with the intention of speaking to him "on two issues": (1) to assess whether defendant needed medical care; and (2) to determine whether defendant understood "that he was in custody in connection with a violation of a restraining order." Paul introduced himself to defendant, who in turn stood up and shook his hand. He advised defendant that he wanted to know whether defendant was injured and to confirm that defendant was aware that he had been detained for violating a restraining order.
Referring to his report documenting the encounter, Paul testified: "[W]hen I expressed to Mr. Melendez that I understood he may be limping, he said something to the effect that if you were walking around for as long as I was, your legs would hurt too." When he asked defendant if he wanted to see a doctor, defendant replied: "You probably want to get the gun." When the prosecutor asked Paul whether he engaged in any "prompting ... when *326 [defendant] made this statement[,]" Paul responded, "No."
According to Paul, he told defendant that he did not intend to speak with him about the investigation because he had requested an attorney. Reading directly from his report, Paul testified defendant replied: "I'm sure I'm going to get an attorney because of what I did." Paul told defendant "not to make any additional statements," based on his previous request to speak with an attorney. Despite this warning, defendant asked Paul: "Would it help if I showed you where the gun is?"
This prompted Paul "to cut him off" followed by advising defendant of his rights under Miranda, by giving defendant a preprinted "notification of rights form." Paul witnessed defendant read and sign the form.[2] Paul testified that he again informed defendant that it would be in his "best interest to speak with an attorney." According to Paul, defendant did not heed his advice, and "went on to state it was just an accident, and he wanted to clear it up." Paul again advised defendant that he was "prohibited from approaching him on the topic." Despite this, defendant asked Paul whether he could decide to speak to him about what occurred. Paul answered yes, that defendant was entitled to decide to speak to him, as long the decision was a voluntary one by defendant, without any coercion or pressure by Paul.
Because Paul had no intention of questioning defendant at the time, he was not prepared to audiotape defendant's statement. When Paul asked defendant if he would be willing to wait until Paul obtained a recorder to audiotape defendant's decision to forego having an attorney present before speaking to Paul, defendant declined. Instead, defendant immediately began "talking about the gun." Defendant asked for a piece of paper to draw a map of the location where the gun had last been, and also offered to take the police to the location.
At this point, defendant began to describe many more details about the events of October 9, 2003. According to Paul, defendant explained that he and his wife were going through a "turbulent divorce." He was only allowed to go to the marital residence to work on company vehicles. He arrived at what had been the marital residence at around 7:40 a.m. on Thursday, October 9, 2003. His wife gave him a cup of coffee. He asked her to give him a ride to the automotive parts store on Route 46 on her way to work.
Defendant had placed a handgun he had found the previous day in his wife's minivan. He told Paul that he and his wife started arguing during the trip to the automotive parts store. At one point in the argument, defendant pulled out the handgun he had placed in the minivan. This startled and frightened his wife, causing her to change her route and drive directly to the Rockaway Townsquare Mall, where she parked by the Sears Store. Once parked, the couple continued to argue as defendant held the handgun. At around 8:30 a.m., defendant claimed the weapon "somehow [] went off ... more than once," fatally wounding his wife. Instead of seeking medical attention, defendant allegedly reclined his wife's car-seat and fled on foot into a wooded area off Mount Hope Road, where he allegedly buried the handgun next to a large rock. According to Paul, defendant said: "This was not supposed to happen. It was just an accident[.]"
*327 After collecting defendant's clothes for forensic analysis, Paul and a group of other officers assigned to investigate the case transported defendant to the wooded area where defendant had discarded the handgun, and began searching for the weapon. According to Paul, in addition to telling him where to park and from which point to enter the woods, defendant told him that he hid a gray sweatshirt and a pack of Salem cigarettes in a different area of the woods.
After approximately three hours, the officers decided to stop the search for a meal break. The officers temporarily removed defendant's handcuffs and provided him with food which he ate in the company of his guardians. Paul described defendant's demeanor during this time as "cordial, cooperative [and] [i]t seemed like he wanted to interact. He wanted to get a lot off his chest." When the search resumed, defendant told the officers that he had found the rock where he had hidden the handgun. After summoning the search party to this location, Paul began digging, following defendant's instructions, and found a Walther PPK .32-caliber semiautomatic handgun. The weapon was immediately seized and placed into evidence.
At this point, Paul asked defendant to take him to the location in the mall's parking lot where the killing had occurred. Paul testified defendant took him and his fellow investigators to the place where the minivan had been found with the victim's body inside. Because Paul had been among the group of investigators who had previously responded to this location, he was able to confirm the accuracy of defendant's directions. Paul and the investigation team returned defendant to the Rockaway Police Station later that evening, where defendant was again given his rights under Miranda and signed a document attesting to this fact.
Morris County Prosecutor's Office Detective Gregory Rossi's testimony corroborated Paul's account of events and interactions with defendant. Rossi was with Paul when they first responded to the crime scene where the victim's body was found inside the minivan. He was also part of the team of investigators that accompanied defendant to the wooded area where the gun was found, and was present when defendant gave a statement revealing the details of the crime he had committed. Although most of Rossi's testimony echoed Paul's account of events, we cite Rossi's specific observations of the crime scene to illustrate how it coincides with defendant's description of the events that led him to kill his wife:
I first walked over to the minivan which I noticed was secured with yellow plastic crime scene tape. My initial observation was also [that] the victim was seated in the driver's seat, Barbara Melendez.
Q. What was her positioning [sic] in the driver's seat?
A. The seat appeared to be completely reclined. She was fully clothed and from looking at the right side of her body, she had numerous gunshot wounds that were obvious to me, four on the right side and then one in the upper center chest.
Q. Okay. Was there anything covering the body at all?
A. There were a few layers of multi-colored tissue paper just covering the lap area.
Q. Did you make any other observations of the scene at that time?
A. Initially I observed three shell casings on the dashboard, two all [of] the way over to the left which would be the driver, one over to the far right on the passenger side and it wasn't until Miss Melendez was removed from the ... *328 driver's seat that I noticed two other shell casings at her feet.
Q. Okay. Aside from those shell casings at that time, did you notice anything else?
A. I also noticed two coffee cups or travel mugs. One was in a cup holder on the passenger side and was tilted to the driver's side. And the other mug was also at the feet of the victim.
Rossi took defendant's statement upon his return to the police station from the search of the handgun. He also witnessed defendant sign the written waiver of his rights under Miranda. According to Rossi, defendant explained that at approximately 7:40 a.m. on Thursday, October 9, 2003, he was at his wife's residence repairing one of his company's trucks. When his wife approached him with two mugs of coffee, he asked her if she would take him to the Autozone Repair Parts store on Route 46 in Rockaway. Defendant had a.32-caliber Walther PPK semi-automatic handgun in his pocket. He found the weapon the day before under the seat of one of the trucks that he was repairing. He also placed 32 caliber rounds into his jacket pocket.
While en route to the Autozone, defendant and his wife argued about the restraining order, lawyers, and money. According to Rossi, defendant said that at some point, he removed the handgun and pointed it at the windshield. They arrived at the Sears parking lot at around 8:20 a.m. Defendant was holding the gun in his right hand; he said the gun discharged "a lot" while he was bouncing it. Rossi testified that defendant said he reclined his wife's car seat, picked up the handgun that had fallen to the floor, put it in his right rear pant pocket, and walked quickly away from the mall. According to Rossi, defendant said he stayed in the woods through the night. The following morning, he buried the handgun and decided to turn himself over to the police.

C

Psychiatric Testimony
Forensic psychologist Dr. Elliott Atkins testified on defendant's behalf at a N.J.R.E. 104 hearing. He examined defendant, conducted psychological testing, reviewed medical records, and interviewed defendant's siblings. Dr. Atkins opined that at the time defendant was questioned by the police, he could not have knowingly, voluntarily and intelligently waived his Miranda rights. Dr. Atkins diagnosed defendant as suffering from a "borderline personality disorder ..., which predisposes someone to psychotic episodes." According to Dr. Atkins, this disorder causes a loss of contact with reality and "was certainly present at the time he committed the crime...."
Dr. Atkins described defendant's turbulent childhood. His mother was not available to him, leaving his sometimes abusive father as the source of "nurturance" during his early childhood. The father left when defendant was eleven years old and was never heard from again. Defendant later learned that his father had committed multiple homicides and eventually took his own life.
Dr. Atkins also diagnosed defendant with "Post Traumatic Stress Disorder" (PTSD) related to his experiences while serving in the military in Vietnam. Although he has not received psychotherapy for this condition, defendant has been taking benzodiazepine[3] for the past twenty-two *329 or twenty-three years. Defendant attempted various times to stop taking this medication without success. Those times that he tried to stop taking benzodiazepine he experienced "the typical symptoms of cessation," which included "a dramatic increase in anxiety, [and] all kinds of psychological problems including shaking, diarrhea, chest pains, [and] palpitations." Over the years, his dosage of benzodiazepine was increased six-fold, from .25 milligrams to 1.50 milligrams.
Dr. Atkins testified that defendant stopped taking the benzodiazepine several days before his arrest. Thus, by the time he gave his statement to the various investigators he was likely a week without medication. According to Dr. Atkins, at the time he gave the inculpatory statement to Paul and Rossi, defendant "was at the height of the period of time that he would be experiencing these kinds of withdrawal symptoms...." He thus opined that
the cessation of the use of that medication combined with [defendant's] borderline personality disorder contributed to his loss of contact with reality ... [and] affected him both during and after the ... offense, and both during and after his giving of the statement.
Dr. Atkins noted that jail psychiatric records indicated that defendant was diagnosed "as being psychotic"; some of the symptoms he exhibited were attributed to benzodiazepine withdrawal. On cross-examination, Dr. Atkins conceded that he had not reviewed records from other therapists that defendant alleged he had seen while in the military.
Psychiatrist Dr. Robert Sadoff performed a clinical examination of defendant and reviewed Dr. Atkins's testing. He independently diagnosed defendant with three "Axis One" DSM[4] disorders. He agreed with Dr. Atkins that defendant suffers from PTSD from his experiences in Vietnam. Dr. Sadoff also concurred with Dr. Atkins that defendant suffers from psychotic disorder not otherwise specified. He defined this illness to mean that defendant "is not in touch with reality, that he's living within his own delusional system, his own thoughts processes which are not always shared by those outside of his own system."
Dr. Sadoff also noted benzodiazepine withdrawal as an independent basis for defendant becoming psychotic. Based on defendant's account of having hallucinations while in the forest after the shooting, coupled with the determination by the prison medical staff that defendant was "psychotic" when he arrived at the prison hospital, Dr. Sadoff opined that defendant was continuously psychotic from the time in the forest, until he received treatment at the prison. He further opined that defendant's "mental conditions would have impaired his mental stability and would likely have affected his ability to give [a] voluntary statement" to the police.
On cross-examination, Dr. Sadoff admitted that defendant "understood his Miranda rights." He also stated that defendant never told him that he was hallucinating while in the woods with the officers.
Psychiatrist Dr. Charles Martinson, M.D. testified for the State. He examined defendant to determine "whether he was criminally insane or whether mental disease affected his ability to ... conduct himself knowingly and purposefully in connection with" his wife's shooting. Based on his review of all the documents and his interview with defendant, Dr. Martinson opined that defendant's statements and waiver of Miranda rights were knowing, *330 intelligent, and voluntary. Although he diagnosed defendant with anxiety disorder not otherwise specified, he found "defendant suffered from no mental disease or defect or incapacity that would have affected his ability" to voluntarily waive his rights. In Dr. Martinson's opinion, there was nothing to suggest any sort of psychotic decomposition or break from reality.
On cross-examination, Dr. Martinson admitted that it was possible that defendant was suffering from PTSD. He was also undecided on whether defendant was suffering from benzodiazepine withdrawal. Although medical records from both the prison and the Morristown Memorial Hospital (where defendant was sent by the prison for psychological testing) suggested defendant was suffering from benzodiazepine withdrawal, he found defendant did not exhibit sufficient physical symptoms to support Dr. Sadoff's definitive diagnosis.

II
The trial court denied defendant's motion to suppress the inculpatory statements. Given the presence of an abandoned handgun in an area accessible by the public, the court found the concern for public safety authorized the interrogating officers to question defendant without adhering to the Miranda rule. Alternatively, the court found defendant continually initiated conversations with the police, "arguably to convince law enforcement of the accidental nature of the shooting." The court thus found that the State established that defendant knowingly, intelligently, and voluntarily waived his Miranda rights.
At trial, defendant opted to testify in his own defense. He described his combat experiences as a soldier in Vietnam, which included witnessing a friend's suicide and almost being shot himself. He had difficulty coping after returning from his tour of duty and did not leave his house for "six to eight months."
He married the victim of this shooting in 1974. They had three children. He began having marital difficulties in 1995, and they separated in 1997. Although they reconciled in 1999, they continued to have problems including an incident of domestic violence in 2002. Acting on his wife's complaint, the court issued a restraining order against defendant, barring him from the marital residence and from having any contact with his wife and the children.
His wife filed a second complaint for divorce in 2002. As a means of concealing marital assets, defendant testified that in March or April of that year he buried several hundred thousand dollars at his brother's house. His business closed between March 2002 and October 2003 because he could not function medically or emotionally.
In October 2003, the Family Part ordered defendant to sell his company's trucks to pay court-ordered spousal support. Because the trucks were kept at the marital residence where his wife lived, his wife agreed to permit him access to the house in order to repair the trucks for sale. According to defendant, at this time he also learned that his wife was seeing another man. Despite this, he believed reconciliation was still possible because he and his wife began to socialize.
He worked on the trucks during the week before the killing without incident. On the day before the shooting, he was searching for some of his things in the garage when he found a "yellow comic book wrapped up in plastic in a small box." He found a handgun inside the box. He testified that he did not know how the weapon ended up in the garage. He "panicked" when his wife arrived home and threw the handgun under the seat of a *331 truck. After speaking briefly with his wife, he locked the truck that contained the gun and left.
On the night before the shooting, he received a phone call from his daughter that made him disoriented and distraught. He thought about taking his own life because he had lost his family, and because of "everything [else] that was going on." He did not sleep that night and was "seeing things."
He returned to the marital residence the next day intending to continue his work on the trucks. He grabbed the handgun because he thought about killing himself. However, when his wife came out of the house carrying two mugs of coffee, one for herself and one for him, he threw the handgun back under the seat of the truck.
After engaging in what defendant characterized as "fooling around ... a little bit," he and his wife got in her van to drive to Rockaway Mall. When asked on direct examination: "Where was the gun?" defendant testified that he "put it" in a leg brace he had on at the time, because he was "kind of" still intent on killing himself.
When they arrived at the Rockaway Mall, his wife parked the van in the Sears parking lot. According to defendant, at first they were "starting to fool around a little bit." He then realized, however, that his wife was not wearing her wedding rings. When he asked her what happened to the rings, she told him that she had sold the rings for extra money. This prompted an argument that caused his wife to scream about being late for work and insisting that she needed to report to work, which was around the corner from where they were parked.
At this point, defendant admitted to killing wife.
[DEFENSE COUNSEL:] Mr. Melendez, tell us what happened.
[DEFENDANT:] ... She kept screaming. She started saying things. She attempted to try to grab me, and I just wasn't responding. And she sheshe said, she started saying things, you're getting old, you're no good, you can't get it up, what's wrong. Look at you. Just mean things. She just kept saying things like that. And I don't ...
....
[DEFENSE COUNSEL:] Mr. Melendez. Tell us about how you felt. What happened?
[DEFENDANT:] I don't know. I wasjust had no experience. I loved my wife so much.
[DEFENSE COUNSEL:] Did you fire the gun Mr. Melendez?
[DEFENDANT:] I must of.
[DEFENSE COUNSEL:] Six times, Mr. Melendez?
[DEFENDANT:] I don't know. I don't know. I don't have an explanation of what happened at that point there. I found myself back in Vietnam in that truck. I looked at the window and the mall was gone. There was no mall there. I looked out the back and I could see through the car.
The machine was running next to me. Some kind of heavy equipment running real loud. I don't know. I don't know how to explain it, it's just something I never experienced before. It was like I wasn't there. I could see myself from above, looking down.
[DEFENSE COUNSEL:] What did you do next, Mr. Melendez?
[DEFENDANT:] I sat there, I don't know seconds, maybe. I don't know. And I know, something tells me I have to go to work. I didn't go to work.
[DEFENSE COUNSEL:] Did you see if Mrs. Melendez was okay?

*332 [DEFENDANT:] I kissed her. She was okay.
[DEFENSE COUNSEL:] What did you do after that Mr. Melendez?
[DEFENDANT:] I'm sorry.
[DEFENSE COUNSEL:] Did you put some tissue paper on her?
[DEFENDANT:] Yea. I thought her legs would be cold. So, since we marriedwe were married, I always kept her feet and legs on my belly. And we slept. I always tried to keep her legs warm. So, Ithat's what I was trying to do.
Defendant then got out of the van and started walking around the mall. He eventually walked into the woods feeling sick. He buried the handgun in the woods and flagged down a police officer because he "wanted to see if he could help...." He remembered drawing a map for Captain Paul and taking the officers to the location where he had buried the handgun.

III
Against this evidence, defendant now raises the following arguments:
POINT I
THE POLICE VIOLATED DEFENDANT'S FIFTH AMENDMENT AND STATE COMMON LAW RIGHT TO COUNSEL BY QUESTIONING HIM AFTER HE INVOKED HIS RIGHT TO COUNSEL. SINCE DEFENDANT'S RIGHTS WERE NOT [SCRUPULOUSLY] HONORED, HIS SUBSEQUENT STATEMENTS AND THE EVIDENCE SEIZED AS A RESULT OF THOSE STATEMENTS, NAMELY THE GUN, MUST BE SUPPRESSED AS FRUITS OF THE POISONOUS TREE. U.S. Const. Amends. V; XIV; N.J. Const. Art. I, ¶ 1.
POINT II
THE FAILURE TO CHARGE DIMINISHED CAPACITY WAS PLAIN ERROR BECAUSE THE RECORD CLEARLY INDICATED EVIDENCE OF A MENTAL DISEASE OR DEFECT THAT COULD HAVE NEGATED THE STATE OF MIND REQUIRED FOR THE OFFENSES. U.S. Const. Amend. V, VI, XIV; N.J. Const. Art. I, ¶ 10. (Not Raised Below)
POINT III
DEFENDANT'S LIFE SENTENCE WAS EXCESSIVE. U.S. Const. Amend. VI, XIV; N.J. Const. Art. I, ¶¶ 1,9,10.
We first address the trial court's ruling admitting defendant's inculpatory statement pursuant to the public safety exception under Quarles, even after defendant had been informed of his rights under Miranda and, as a result, requested to consult with an attorney.
The Fifth Amendment of the United States Constitution provides that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This provision applies to the states through the fourteenth amendment. Malloy v. Hogan, 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 658 (1964). Although our State's Constitution does not contain a similar analog, the right against self-incrimination is recognized under our common law and is clearly embedded in our rules of evidence. State v. Reed, 133 N.J. 237, 250, 627 A.2d 630 (1993); N.J.R.E. 503.
In Miranda v. Arizona, the United States Supreme Court held that the "Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice ... [regarding] the right to the presence of an attorney." Edwards v. Arizona, 451 U.S. 477, 481-82, 101 S.Ct. *333 1880, 1883, 68 L.Ed.2d 378, 384 (1981) (citing Miranda, supra, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726). A waiver of such rights is only valid if it was made "voluntarily, knowingly and intelligently." Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707. Accord State v. Galloway, 133 N.J. 631, 654, 628 A.2d 735 (1993).
The invocation of the right to counsel by an accused must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975) (quoting Miranda, supra, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726). Once an accused invokes the right to counsel, the interrogation must stop until counsel is present "unless the accused [] initiates further communication, exchanges, or conversations with the police." Edwards, supra, 451 U.S. at 484-85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. The initiation of conversation after invoking his right is admissible only if the initiation constitutes a knowing, intelligent, and voluntary waiver of the right to counsel. See Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707.
The public safety exception to the requirement of giving a Miranda warning prior to interrogation was first recognized by the United States Supreme Court in New York v. Quarles, supra. This exception allows police to question an accused, prior to giving Miranda warnings, when there is a public safety concern. Quarles, supra, 467 U.S. at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 558. Our Supreme Court adopted the public safety exception in State v. O'Neal holding that the questioning of a suspect prior to the administration of Miranda warnings was acceptable when the situations presented an "objectively reasonable need to protect the police or the public from any immediate danger associated" with a weapon. 190 N.J. 601, 618, 921 A.2d 1079 (2007) (quoting Quarles, supra, 467 U.S. at 659 n. 8, 104 S.Ct. at 2633 n. 8, 81 L.Ed.2d at 559 n. 8).
Cases decided prior to O'Neal established the framework to determine whether the public safety exception could be applied to a given situation. See, e.g., State v. Stephenson, 350 N.J.Super. 517, 525, 796 A.2d 274 (App.Div.2002). The "State must generally demonstrate 1) there was an objectively reasonable need to protect the police or the public; 2) from an immediate danger; 3) associated with a weapon; and that 4) the questions asked were related to that danger and reasonably necessary to secure public safety." Ibid. (quoting State v. Prim, 134 Ohio App.3d 142, 730 N.E.2d 455, 463 (1999), motion for delay appeal denied, 88 Ohio St.3d 1436, 724 N.E.2d 811 (2006)). In the case of a gun, it must be reasonably believed that the gun is in an unknown location, which is accessible to third parties that is incapable of being reasonably secured. Id. at 528, 796 A.2d 274.
Application of the public safety exception generally requires a concern for the protection of the public at large, or an extended group of individuals, such as children. See United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992) (holding that public safety exception applied when officer had a reasonable concern that a gun that was tossed away in a mall parking lot could be found by a child).
With these principles in mind, we must determine whether the public safety exception applies after Miranda warnings had been given. Although this issue was noted in State v. Pante, 325 N.J.Super. 336, 346, 739 A.2d 433 (App.Div.1999), certif. denied, 163 N.J. 76, 747 A.2d 285 (2000), it has not been definitively addressed in a published opinion by any court in this State.
*334 In United States v. DeSantis, the Ninth Circuit Court of Appeals held that "[t]he same considerations that allow the police to dispense with providing Miranda warning in a public safety situation also would permit them to dispense with the prophylactic safeguard that forbids initiating further questioning of an accused who requests counsel." 870 F.2d 536, 541 (9th Cir.1989). In reaching this conclusion, the DeSantis court emphasized that the guiding policy considerations of Quarles (the disinclination of the accused to disclose information about the location of a weapon and the overriding societal interest in preventing the potential loss of life) applied with equal force after counsel was requested. Ibid. Relying on DeSantis, the Fourth Circuit Court of Appeals came to the same conclusion in United States v. Mobley, 40 F.3d 688, 692 (4th Cir.1994), cert. denied, 514 U.S. 1129, 115 S.Ct. 2005, 131 L.Ed.2d 1005 (1995).
Other state courts have followed the Ninth Circuit's reasoning. See Borrell v. State, 733 So.2d 1087, 1089 (Fla.Dist.Ct. App.1999), review denied, 751 So.2d 1250 (Fla.2000) (rejecting defendant's argument that the public safety exception only applies pre-Miranda); Trice v. United States, 662 A.2d 891, 895 (D.C.1995) (finding that "when a police officer asks a question after a suspect has asserted the right to counsel, the suspect's response will be admissible in evidence if" the officer's questions and the situation meets the Quarles standard); State v. Kunkel, 137 Wis.2d 172, 186-90, 404 N.W.2d 69, 75-77 (Wis.Ct.App.), cert. denied, 484 U.S. 929, 108 S.Ct. 297, 98 L.Ed.2d 256 (1987) (employing the cost-benefit analysis in Quarles to hold that the "rescue doctrine" can be invoked by police officers after a request for counsel has been made). This approach is not without critics, however. In People v. Laliberte, 246 Ill.App.3d 159, 172, 186 Ill.Dec. 9, 615 N.E.2d 813, 822-23 (1993), the Appellate Court of Illinois declined to adopt the Quarles public safety exception to a case where the right to counsel had been invoked.
Here, defendant argues that the "public safety" exception "only applies as an exception to Miranda's prophylactic procedural requirements. Therefore, it cannot be used to excuse the police's failure to scrupulously honor a defendant's invocation of his [F]ifth [A]mendment rights." According to defendant, the police used the public safety exception here merely to encourage him to abandon his right to counsel. Citing State v. Hartley, 103 N.J. 252, 272, 511 A.2d 80 (1986), defendant emphasizes that our New Jersey Supreme Court has recognized that there is a "qualitative difference" between a violation of the Miranda holding, and a failure to honor the constitutional right against self-incrimination that Miranda was intended to protect.
The State argues that the situation we confront here: (1) a presumably loaded handgun left in a public place potentially near children; and (2) the limited nature of the police officers' questions designed to disclose only the location of the weapon, squarely fits the "public safety" exception recognized in Quarles.
As a starting point, we note that there is a fundamental difference between a violation of Miranda's procedural requirements, and a violation of the constitutional right against forced self-incrimination. "While informing the accused of his rights is not a constitutional mandate, preventing coerced self-incriminating statements clearly is." DeSantis, supra, 870 F.2d at 540 (citing Quarles, supra, 467 U.S. at 654, 104 S.Ct. at 2630, 81 L.Ed.2d at 556).
The public safety exception that allows a police officer to ask questions *335 about the location of a weapon believed to be in a public place, prior to administering Miranda warnings, does not nullify the underlying constitutional rights the warning is intended to protect. Quarles only provides an exception to Miranda's protective and preventive procedural requirement. "In exigent circumstances, the Court's prudential policy of requiring Miranda warnings to ensure that any waiver of [F]ifth and [S]ixth [A]mendment rights will be informed, or intelligent, is outweighed by the need for the police to act decisively and promptly." DeSantis, supra, 870 F.2d at 540 (citing Quarles, supra, 467 U.S. at 657-58, 104 S.Ct. at 2632, 81 L.Ed.2d at 557-58). Quarles does not in any way allow police officers to compel self-incriminating statements; it only discards Miranda requirements that provide assurance that the waiver of rights was informed and intelligent. 467 U.S. at 655 n. 5, 104 S.Ct. at 2631 n. 5, 81 L.Ed.2d at 556 n. 5.
We are persuaded that the reasoning in DeSantis reflects a proper and constitutionally valid application of the public safety exception. Analytically, we discern no meaningful distinction between a pre-Miranda and a post-Miranda application of the public safety exception. The driving safety concerns underpinning the exception are not diminished by a defendant's invocation of his or her right to counsel. The same public safety concerns apply in a case in which a defendant requests the presence of counsel, and thereafter the police learn about the threat posed by a weapon discarded in a public place. Under these circumstances, the officer may question the suspect about the location of the weapon prior to counsel being provided, because the same "exigent circumstances" outweigh the need for the police to wait for counsel to arrive simply to assure that any waiver of rights was informed, voluntary and intelligent. We emphasize, however, that the public safety exception does not allow the police officer to compel these statements.
Having decided the applicability of the public safety exception to post-Miranda settings, we must next determine whether the facts before us support its invocation. We hold the relevant facts do not meet the requirements of the exception as outlined in Stephenson, supra, 350 N.J.Super. at 525, 796 A.2d 274. The best way to explain our holding is to apply each of the Stephenson factors to the facts developed from the start of defendant's interactions with the police.
The first factor requires the police to show an "objectively reasonable need to protect the police or the public." Ibid. When defendant flagged down the passing police car, Officer Hulsman had defendant's photograph with the words "[s]uspected, armed and dangerous" written on the back. This clearly gave Hulsman probable cause to detain defendant and pat him down to ensure he was not armed. Beyond this, it is not unreasonable for a police officer in Hulsman's situation to ask defendant if he had any weapons.
From this point on, however, the actions of the police at the scene became more problematic. When Officer Herda came upon defendant, he was handcuffed and seated in Hulsman's police car. At this point, there was no justification for Herda to ask defendant if he had any weapons. Despite defendant answering "[n]o," Herda asked defendant if he had any weapons on him prior to being stopped. Given that defendant had told Hulsman that he was invoking his right to counsel, this question was entirely improper.[5] There was no legal *336 justification for any further questioning of defendant without his attorney being present.
Defendant nevertheless replied to Herda's question: "[Y]eah, but I don't have it now." He also asked Herda: "Do you think I need any attorney?" Herda responded by telling him that he was entitled to an attorney, but he was concerned that someone could get hurt with the suspect's weapon because people, including kids, use the area nearby to hike and fish. Herda then asked defendant to tell him where he had discarded the handgun, to which defendant responded by motioning with his head toward the area of Mount Hope Pond.
According to Herda, there was a cabin in the direction mentioned by defendant that was used year-round by the Rockaway Township Sportsmen and the Boy Scouts. This lack of specificity as to the location of the weapon here is in sharp contrast to the circumstances the Court confronted in Quarles, where a man, suspected of having just raped a woman using a gun, ran inside a supermarket out of the police's view, and was wearing an empty shoulder holster when he was apprehended. The arresting officers immediately handcuffed the suspect and, without administering Miranda warnings, asked him where the gun was. Quarles, supra, 467 U.S. at 652, 104 S.Ct. at 2629, 81 L.Ed.2d at 554.
Unlike the defendant's nod in Quarles, directing the police to a particular area of the supermarket, defendant's head movement here covered a vast wooded area, defined only by an unknown proximity to a cabin used by the Boys Scouts and a club of outdoorsmen known as the Rockaway Sportsmen. At the time Herda asked defendant to reveal the location of the weapon, he did not know if the cabin was actually being used by any of these groups. Again in contrast to Quarles, defendant here discarded and concealed the weapon at least twelve hours earlier. Stated differently, the circumstances here lack the two critical elements relied on by the Court in Quarles: specificity of location and temporal immediacy.

IV
The misapplication of the public safety exception, however, does not mandate the reversal of defendant's conviction. The record supports the trial court's finding that defendant knowingly and voluntarily waived his rights to counsel when he admitted to killing his wife and disclosed the location of the handgun to Captain Paul and Detective Rossi.
A police officer must "scrupulously honor" the invocation of the right to counsel. This requires the interrogating officer to cease all questioning until an attorney is present. Edwards, supra, 451 U.S. at 482, 101 S.Ct. at 1883, 68 L.Ed.2d at 384. A defendant may nevertheless waive this right, provided the waiver is made voluntarily, knowingly and intelligently. Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707. If "the accused himself initiates further communication, exchanges, or conversations with the police," the police officer may continue the interrogation in the absence of counsel. Edwards, supra, 451 U.S. at 485, 101 S.Ct. at 1885, 68 L.Ed.2d at 386.
This type of waiver requires the suspect to "personally and specifically" initiate *337 conversation. State v. Burris, 145 N.J. 509, 519, 679 A.2d 121 (1996) (citing Edwards, supra, 451 U.S. at 484-85, 101 S.Ct. at 1884, 68 L.Ed.2d at 386). A suspect "initiates" if he invites conversation on the crimes for which he is being held. State v. Fuller, 118 N.J. 75, 82, 570 A.2d 429 (1990). The state must prove that the initiation constituted a "knowing, intelligent, and voluntary waiver beyond a reasonable doubt." State v. Chew, 150 N.J. 30, 61, 695 A.2d 1301 (1997) (citing Hartley, supra, 103 N.J. at 260, 511 A.2d 80 and State v. Galloway, 133 N.J. 631, 654, 628 A.2d 735 (1993)).
With these principles as our guide, we turn to the specific facts developed before the trial court. After defendant was arrested, the police transported him to the Rockaway Township Police Department. When Captain Paul approached defendant at the station, he told him that he only wanted to discuss two matters: (1) whether he needed medical attention; and (2) whether he understood that he was being held for violating a restraining order. Paul informed defendant that he was aware of a possible injury to his leg because he was limping. Defendant replied: "[I]f you were walking around for as long as I was, your legs would hurt too."
Paul then asked defendant if he wanted to see a doctor. Defendant replied: "You probably want to get the gun." At this point, Paul advised defendant that he did not intend to speak with him about the investigation because defendant had requested an attorney. Defendant replied: "I'm sure I'm going to get an attorney because of what I did." Paul testified that he again informed defendant that it would be in his "best interest to speak to an attorney." In reply, defendant asked Paul: "Would it help if I showed you where the gun is?" Critical to our analysis, Paul responded to this question by giving defendant a written notice of his Miranda rights, which defendant signed and Paul witnessed. Thereafter, defendant asked Paul if he could "make a decision" to speak to him. Paul answered yes, that defendant was entitled to decide to speak to him, as long as the decision was a voluntary one by defendant, without any coercion or pressure by Paul.
From this record, the trial court found defendant initiated conversations about the investigation, despite being informed, orally and in writing, of his right to have counsel present before answering questions or giving information about the crime. There is nothing in this record that would suggest that Paul's interactions with defendant were "reasonably calculated to elicit an incriminating response." State v. Lozada, 257 N.J.Super. 260, 268, 608 A.2d 407 (App.Div.), certif. denied, 130 N.J. 595, 617 A.2d 1218 (1992) (citing Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297, 308 (1980)). From this evidence, the court was entitled to find that Paul scrupulously honored defendant's right against self-incrimination. Thereafter, defendant voluntarily and knowingly opted to give an inculpatory statement.
Detective Rossi was with Paul when this interaction with defendant occurred. The record also supports Rossi's account of defendant's statement and participation in the subsequent search for the discarded weapon. The events at the Rockaway Police Station that led to defendant's knowing and voluntary decision to waive his right to counsel and give an inculpatory statement, and the subsequent search for the weapon are completely independent from and are not tainted by the improper interrogation at the scene of defendant's arrest. See State v. Barry, 86 N.J. 80, 87, 429 A.2d 581, cert. denied, 454 U.S. 1017, 102 S.Ct. 553, 70 L.Ed.2d 415 (1981).

*338 V
Defendant also argues the court committed reversible error by not instructing the jury on diminished capacity. Because defendant did not object to the court's charge at trial, we review this argument under the plain error standard. State v. Williams, 168 N.J. 323, 335, 774 A.2d 457 (2001). Under this standard of review, we must conclude that the failure to give a diminished capacity charge here was not "clearly capable of producing an unjust result." R. 2:10-2.
Diminished capacity is a "failure of proof" defense. State v. Reyes, 140 N.J. 344, 354, 658 A.2d 1218 (1995). Evidence of diminished capacity negates the State's proof that a defendant had the necessary mental state to commit the crime. Ibid. The diminished capacity defense is statutorily recognized as part of our criminal code.
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.
[N.J.S.A. 2C:4-2]
The State retains the burden to prove that defendant acted with the required mental state even if he introduces evidence of mental state or disease. This "statutory defense ... contemplates a broad range of mental conditions that can be a basis for the defense: `The variety and forms of mental disease are legion.'" Galloway, supra, 133 N.J. at 641, 628 A.2d 735 (quoting State v. Breakiron, 108 N.J. 591, 618 n. 10, 532 A.2d 199 (1987)).
A court must instruct the jury on diminished capacity "when defendant has presented evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or mens rea." Id. at 647, 628 A.2d 735. "All mental deficiencies, including conditions that cause a loss of emotional control, may satisfy the diminished-capacity defense" if accepted in the psychological field, and if "the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form" the required mental state. Ibid.
Although defendant presented expert testimony concerning his history of mental illness and emotional trauma, this evidence did not specifically relate to his mental state at the time he killed his wife. More importantly, despite his initial intentions of presenting a diminished capacity defense to the jury, defense counsel decided, as a matter of trial strategy, not to pursue this line of defense.
As the record shows, at the end of the State's case defense counsel addressed the court directly and stated: "Judge, my client at this juncture has decided that he does not want to pursue the diminished capacity.... [A]s of this moment I have no intention pursuant to my client's wishes of pursuing diminished capacity, and that's the best that I can give the Court." The trial judge then asked defense counsel whether he had explored the defense of diminished capacity originally put forth by counsel's predecessor. Defense counsel responded:
I certainly did not overlook this defense filed by my predecessor counsel. And the reports that were submitted by doctors pursuant to my predecessor counsel's instructions.
So, I have considered the defense very seriously, and so has Mr. Melendez, as *339 well as other psychiatric defenses. And it is Mr. Melendez's choice, as we sit here today, not to present any psychiatric defenses.
Based on this record, defendant's argument in this respect lacks sufficient merit to warrant extensive discussion in a written opinion. R. 2:11-3(e)(2).

VI
Defendant argues that his sentence of life imprisonment was excessive and it should be reduced to thirty years without parole. We disagree.
We review a sentence imposed by the trial court to determine whether the court erred in the exercise of its discretionary authority and its finding of the relevant aggravating and mitigating factors in N.J.S.A. 2C:44-1. State v. Pierce, 188 N.J. 155, 166, 169-70, 902 A.2d 1195 (2006). In discharging this responsibility, we must determine
first, whether the correct sentencing guidelines ... [or] presumptions, have been followed; second, whether there is substantial evidence in the record to support the findings of fact upon which the sentencing court based the application of those guidelines; and third, whether in applying those guidelines to the relevant facts the trial court clearly erred by reaching a conclusion that could not have reasonably been made upon a weighing of the relevant factors.
[State v. Roth, 95 N.J. 334, 365-66, 471 A.2d 370 (1984).]
Applying these criteria, we discern no legal basis to interfere with the sentence imposed by the court. With the State's consent, we remand for the trial court to amend defendant's judgment of conviction to reflect the merger of the conviction of second degree possession of a weapon for an unlawful purpose with the murder conviction.
Affirmed and remanded for the limited purpose specified herein. We do not retain jurisdiction.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The Miranda rights form was marked as an exhibit and read into the record before the trial court.
[3] Dr. Atkins characterized benzodiazepine as a "powerful" and "addictive" anxiety medicine.
[4] DSM refers to the Diagnostic and Statistical Manual of Mental Disorders.
[5] Although Herda testified Hulsman did not tell him that defendant had invoked his right to counsel, we impute such knowledge to Herda under these circumstances because law enforcement officers are obligated to scrupulously honor a defendant's invocation of his rights to counsel. Edwards, supra, 451 U.S. at 482, 101 S.Ct. at 1883, 68 L.Ed.2d at 384.