**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1083-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHRISTOPHER DIANTONIO,

    Defendant-Appellant.

_____

Submitted January 22, 2024 – Decided March 25, 2024

Before Judges Gilson and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 21-07-0789.

Jacobs & Barbone, PA, attorneys for appellant (Louis Michael Barbone, on the brief).

William E. Reynolds, Atlantic County Prosecutor, attorney for respondent (Linda Anne Shashoua, Assistant Prosecutor, of counsel and on the brief; Courtney Marie Cittadini, Chief Assistant Prosecutor, on the brief).

PER CURIAM

Following the denial of his motion to suppress statements he had given to law enforcement personnel, defendant pled guilty to second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b)(1). He was sentenced to five years in prison with three and a half years of parole ineligibility. Defendant now appeals from the order denying his motion to suppress his statements.

Police officers questioned defendant after he came to the hospital with a gunshot wound to his lower leg. Three officers questioned defendant in three segments over the course of approximately seventy minutes. At no time was defendant given his Miranda[1] rights. The motion judge held that the questioning was lawful because during the first two segments, defendant was not a suspect, and in the third segment, the questioning was justified under the public safety exception because the police were trying to locate the gun. The testimony at the evidentiary hearing does not support that finding. Instead, the officers' testimonies establish that during the third segment of the interrogation, the officers believed defendant shot himself, and their questions focused on how he shot himself. Accordingly, because the officers did not give defendant his Miranda rights at the time that he became a suspect, the last part of the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

interrogation violated defendant's Fifth Amendment rights, and that portion of defendant's interrogation should have been suppressed. We, therefore, reverse in part the order denying the motion to suppress. We also reverse defendant's conviction, vacate his plea and sentence, and remand for further proceedings.

I.

We discern the facts from the record, including the three-day evidentiary hearing on defendant's motion to suppress his statements. Three Atlantic City police officers testified at the hearing: Detective Matthew Cocuzza, Detective Armani Rex, and Sergeant Innocenzo Visceglia. The State also introduced into evidence and played the audio recordings of the three segments of the officers' questioning of defendant. In addition, the State submitted transcripts of the audio recordings. Defendant did not testify, nor did he call any witnesses. His counsel did submit several documents into evidence, including the affidavit of probable cause related to the charges filed against defendant.

On August 12, 2020, defendant arrived at the emergency room at the Atlantic City Regional Medical Center with a gunshot wound to his lower right leg. Apparently, the hospital notified the police, and several officers responded to investigate. All the questioning of defendant took place while he was in the emergency room.

A-1083-22

Cocuzza questioned defendant first, and the first segment of questioning lasted approximately twenty minutes. Cocuzza testified that he considered defendant to be a victim of a shooting and, therefore, did not give defendant Miranda warnings. Cocuzza asked defendant to tell him what happened. In response, defendant told a detailed story about how he was outside on a street smoking when he saw two men in a BMW "cruising slow." Defendant started to walk away, then heard a shot, and he ducked down behind a parked car. Thereafter, defendant began to run, and the men in the BMW fired several shots. One of the shots struck defendant in the leg.

Cocuzza then questioned defendant to try to determine where the shooting occurred, but defendant's descriptions of the location did not make sense to Cocuzza, and defendant's descriptions were not consistent. At the hearing, Cocuzza explained that he was questioning defendant to try to determine the location of the shooting so that police could investigate the scene.

After the first segment of questioning ended, Cocuzza spoke with Marcus Gunn, who told him that he had driven defendant to the hospital after defendant had arrived at an inn where Gunn was staying. Gunn also explained that when defendant arrived, he had already been shot. At some point during or shortly after the first segment of questioning, Cocuzza also learned that hospital

personnel had found marijuana and heroin on defendant's body and in his clothing.

Approximately fifteen minutes after the first interview ended, defendant was questioned again. By that time, Rex had arrived at the hospital, and he and Cocuzza questioned defendant for approximately twenty-five minutes. Again, the officers did not give defendant <u>Miranda</u> warnings. At the hearing, Rex testified that he considered defendant a victim.

Rex led the questioning in the second segment and focused his questioning on where defendant had been shot. Defendant repeated his story that two men driving a BMW had shot at him. He described the men as "black" and "Dominican or . . . Puerto Rican." Defendant also stated that the driver was the person who fired the shots. Rex tried to have defendant pinpoint the location of the shooting, but defendant's answers were not specific.

By the end of the second segment of questioning, Rex believed defendant was lying. On cross-examination at the hearing, Rex testified:

> Q.   Whether you focused on him as a victim or not, you did know that lying to a police officer was a crime. You knew that, didn't you?
>
> A.   Yes.

Q. You knew that reporting a false event, a false public emergency, was a crime, you knew that, didn't you?

A. Yes.

Q. You knew that holding a gun, possessing a gun and shooting yourself with it is a crime, you knew that, didn't you?

A. Yes.

Q. You knew all that before you started the third segment of the statement, right?

A. Yes.

Rex also testified that by the end of the second segment of questioning, he believed that defendant had shot himself. In that regard, he testified:

Q. Okay. When you said after the second part of that interview, you believed the wound had been self-inflicted. You said that, do you recall saying that?

A. Yes.

Q. How did you make that conclusion?

A. I looked at his wound . . . .

. . . .

Q. Yes. You were able to conclude that it was self-inflicted, which means of course what he had just got done telling you was probably a lie?

6

A. Yes.

The third segment of questioning was conducted approximately fifteen minutes after the second segment and lasted approximately twenty-five minutes. Three officers were present during that third segment: Cocuzza, Rex, and Visceglia. Visceglia, who was in charge of the Violent Crimes Unit, led the questioning. Again, defendant was not given <u>Miranda</u> warnings. Visceglia testified he did not give <u>Miranda</u> warnings because he did not intend to arrest defendant; rather, he was questioning him about the shooting.

Visceglia started his questioning by asking defendant to tell him what happened. Defendant initially repeated his story of being shot on a street. When pressed for the location of the shooting, defendant said he was shot outside, "in the back of the Quality Inn."

Visceglia's questioning then shifted. He told defendant that he knew about gunshot wounds. He also told defendant that he knew that he had had drugs on him when he came to the hospital. Visceglia explained to defendant that he would probably be charged with possession of the drugs, and "the prosecutor's office" and "[j]udge" would decide what happened concerning the drug charges. At the hearing, Visceglia acknowledged that if he had questioned defendant about the drugs, he knew he had to give defendant <u>Miranda</u> warnings.

7

Visceglia then told defendant: "I know for a fact that this story you're telling me is bullshit. . . . Listen, you're leaving stuff out of this story on purpose." Visceglia thereafter asked defendant who he had been with when he was shot and whether "you guys were f[***]ing around with a gun?" In connection with those questions, Visceglia told defendant:

> The gun that you guys had in the hotel room, I would love to have it, so a kid doesn't get it, but I am not—I am not going to, you know, charge everyone that you were with tonight because I can't find it, but my thing is . . . is it safe? Is a kid going to grab it?

In response, defendant told Visceglia that the gun was safe. Visceglia then questioned defendant on whether one of the people he was with shot him. It was at that point that defendant admitted that he had accidentally shot himself: "I held the gun and I, f[***]ing, shot myself because I thought it was on safety."[2]

In his testimony at the suppression hearing, Visceglia acknowledged that when he started to question defendant, he did not believe the story defendant had told the other detectives and he suspected that defendant had been lying. Visceglia also explained that he believed defendant's gunshot wound was self-inflicted or defendant had been shot by someone standing close to him. Further,

---

[2] The transcript of that same statement reads: "[Inaudible] [I]t's my weed. [Inaudible] I f[***]ing shot myself cuz I thought it was on safety."

A-1083-22

Visceglia testified that he asked defendant about shooting himself "to see his reaction."

> Q. What was your purpose in accusing [defendant] of shooting himself?
>
> A. Just to see his reaction.

After the detectives and sergeant finished questioning defendant, he was charged that same day with second-degree unlawful possession of a handgun and drug-related offenses. Thereafter, defendant was indicted for second-degree unlawful possession of a handgun and third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(1).

On June 2, 2022, after hearing arguments from counsel, the judge denied defendant's motion to suppress his statements and ruled that all parts of his statements were admissible. The judge explained her ruling in an oral opinion placed on the record. Thereafter, the judge memorialized her ruling in an order issued on June 13, 2022.

The judge found that the three officers' testimonies were credible. She found that defendant was always in custody during the questioning because he was wounded and could not move from his hospital bed. The judge found that during the first and second segments of questioning, the detectives were asking defendant questions and viewed him as a victim. Accordingly, the judge

reasoned that defendant was not a suspect during these segments, so the officers did not need to give defendant <u>Miranda</u> warnings.

In analyzing the third segment of questioning, the judge found that the detectives and sergeant believed defendant was lying and that his wound was either self-inflicted or the shot was fired by someone standing close to defendant. The judge also found that Sergeant Visceglia took "a heavy[-]handed approach" in questioning defendant. The judge reasoned that Visceglia was "clearly trying to find out, not just what happened, but who shot . . . defendant and, you know, was it somebody he knew, was it himself, were they messing around with the gun." The judge recognized that the questioning continued without a <u>Miranda</u> warning, even though defendant continued to claim that he was shot by men in a BMW. The judge then found that defendant "confess[ed]" to shooting himself after more questioning from Visceglia. In that regard, the judge reasoned, "[defendant] goes on and on. But he—[Visceglia] then says I think you shot yourself and he elicits this confession."

Applying those factual findings to the law, the judge held that the third segment of questioning was lawful under the public safety exception. In that regard, the judge reasoned that Visceglia was trying to find out the location of the gun. Accordingly, the judge explained:

I think that's why the officers continued to question him is because they wanted to make sure that gun wasn't laying around in a public place. So I'm not suppressing the statements made by [defendant] when he was questioned by the [Atlantic City police officers] on August 12th, without being given his <u>Miranda</u> [r]ights first.

As noted, following the denial of his motion to suppress his statements, defendant pled guilty to second-degree unlawful possession of a handgun without a permit. The drug charges were dismissed, and defendant was sentenced to five years in prison with three and a half years of parole ineligibility. Defendant now appeals from the order denying his motion to suppress his statements.

II.

On appeal, defendant argues his Fifth Amendment right against self-incrimination was violated because the detectives and sergeant who questioned him for over an hour never gave him <u>Miranda</u> warnings. Defendant articulates his arguments as follows:

Point I: The Trial Court Erred As A Matter Of Law In Refusing To Suppress Defendant's Oral Statements Over The Course Of 72 Minutes While The Defendant Was In Custody And Interrogated By Police.

Point II: The Public Safety Exception Was Wholly Inapplicable To These Facts, And The Trial Court

11

Misunderstood And Misapplied The Essential Elements
Required To Trigger The Exception.

When reviewing a decision on a motion to suppress, appellate courts defer to a trial court's factual findings and will uphold those findings when they are supported by sufficient, credible evidence in the record.  State v. Tiwana, 256 N.J. 33, 40 (2023) (citing State v. A.M., 237 N.J. 384, 395 (2019)).  In contrast, appellate courts do not defer to a trial court's legal conclusions, which are reviewed de novo.  Ibid. (citing State v. Rockford, 213 N.J. 424, 440 (2013)).  In that regard, a trial court's legal conclusions "and the consequences that flow from established facts" are reviewed de novo on appeal.  State v. Bullock, 253 N.J. 512, 532 (2023) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

A.    The Fifth Amendment.

The Fifth Amendment of the United States Constitution guarantees all persons the privilege against self-incrimination.  U.S. Const. amend. V.  That privilege applies to the states through the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1; Griffin v. California, 380 U.S. 609, 615 (1965).  In addition, in New Jersey, there is a common-law right against self-incrimination, which has been codified in a statute and a rule of evidence.  State v. Reed, 133 N.J. 237, 250 (1993); N.J.S.A. 2A:84A-19; N.J.R.E. 503.  Accordingly, it has long been established that when a person "is taken into custody or otherwise deprived

of his [or her] freedom," that person is entitled to certain warnings before he or she can be questioned. Miranda, 384 U.S. at 479; see also Tiwana, 256 N.J. at 41; Hubbard, 222 N.J. at 265.

"Custodial interrogation is defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.'" Tiwana, 256 N.J. at 41 (quoting Miranda, 384 U.S. at 444). "In resolving whether police conduct constitutes interrogation or its functional equivalent, [courts] consider whether, under the circumstances, a police officer's questioning or the functional equivalent was 'particularly "evocative"' or 'reasonably likely to elicit an incriminating response.'" Id. at 42 (quoting Rhode Island v. Innis, 446 U.S. 291, 303 (1980)). Courts examine whether the police asked "targeted questions," which demonstrate an attempt to cause the suspect to incriminate himself or herself. See id. at 43-44; Hubbard, 222 N.J. at 271-72; see also State in the Int. of A.A., 240 N.J. 341, 357-58 (2020). If Miranda warnings were required, the failure to administer those warnings "'creates a presumption of compulsion,' and any unwarned statements must be suppressed—even when they 'are otherwise voluntary within the meaning of the Fifth Amendment.'" Tiwana, 256 N.J. at 41 (quoting Oregon v. Elstad, 470 U.S. 298, 307 (1985)).

B.     The Public Safety Exception.

Even when <u>Miranda</u> warnings should be provided, there is a public safety exception.  <u>See</u> <u>New York v. Quarles</u>, 467 U.S. 649, 655-56 (1984); <u>State v. O'Neal</u>, 190 N.J. 601, 618 (2007).  The public safety exception applies in "limited circumstances" and allows law enforcement personnel not to give warnings when there is an "objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon."  <u>O'Neal</u>, 190 N.J. at 618 (quoting <u>Quarles</u>, 467 U.S. at 659 n.8).  To establish that the exception applies, the "State must generally demonstrate '(1) there was an objectively reasonable need to protect the police or the public; (2) from an immediate danger; (3) associated with a weapon; and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety.'"  <u>State v. Stephenson</u>, 350 N.J. Super. 517, 525 (App. Div. 2002) (quoting <u>State v. Prim</u>, 730 N.E.2d 455, 463 (Ohio Ct. App. 1999)).  "Application of the public safety exception generally requires a concern for the protection of the public at large, or an extended group of individuals, such as children."  <u>State v. Melendez</u>, 423 N.J. Super. 1, 24 (App Div. 2011) (citing <u>United States v. Lawrence</u>, 952 F.2d 1034, 1036 (8th Cir. 1992)).

14

The public safety exception does not nullify a person's Fifth Amendment rights. Id. at 26. Instead, it allows a narrow exception when police are trying to locate a gun, but the questioning must be focused on finding the gun and cannot be designed to elicit self-incriminating statements. See id. at 26-27.

C.    Applying the Law to Defendant's Statements.

Before us, the State argues that defendant was never in custody. We reject that argument for two reasons. First and foremost, the motion judge found that defendant was in custody because when he was questioned, he was wounded and lying in a hospital bed in an emergency room where he could not get up and walk away. Those findings are supported by substantial, credible evidence and are consistent with the law concerning when a person is in custody. Second, the State had conceded at the hearing that defendant was in custody. We, therefore, reject the State's attempt to now change its position on that issue.

The motion judge found that the first two segments of defendant's statements were admissible because defendant was not subject to interrogation. Instead, the judge found that Cocuzza and Rex had questioned defendant in an effort to find out who shot him because they viewed him as a victim. Those findings are supported by substantial, credible evidence, including the testimonies of the detectives. Moreover, a review of the questions the detectives

15

asked demonstrates that they were trying to find out where defendant was shot so that they could direct other police officers to investigate the scene of the shooting.

The record, however, does not support the motion judge's finding that the public safety exception applied to the third segment of questioning. By the beginning of the third segment of questioning, both Rex and Visceglia admitted that they knew defendant was lying and believed that either he had shot himself or someone standing close to him had shot him. Partway into the third segment of questioning, Visceglia's questioning of defendant clearly became an interrogation. That shift occurred when Visceglia told defendant: "I know, I know for a fact, I'm not saying like I'm guessing, I know for a fact that this story you're telling me is bullshit." An objective review of the questioning reveals that thereafter, Visceglia was seeking to elicit an admission from defendant that he shot himself. While Visceglia also mentioned that he wanted to find the gun, that was not the focus of his questioning and, more importantly, he did not limit his questioning to determining the location of the gun. Applying the objective facts of Visceglia's questioning to the law, we hold that at that point in the third segment of questioning, defendant was entitled to be given Miranda warnings. Because defendant was not given his Miranda warnings, we suppress the portion

of the interrogation and answers that followed.  Specifically, all questions and answers from page twenty-two of the third segment of the transcript of the audio recording (that is, Da105 in the record on appeal) onward must be suppressed.

Accordingly, we affirm in part and reverse in part the order denying defendant's motion to suppress his statements.  The first and second segments of defendant's statements are admissible.  The third segment is admissible up to the point where Visceglia tells defendant that his story is "bullshit."  That statement and all the questions and answers thereafter are suppressed.  We, therefore, reverse defendant's conviction, vacate defendant's plea and sentence, and remand for further proceedings.

In remanding, we note that there is still substantial evidence the State can use.  In the portion of the statements that is admissible, defendant disclosed that he had been shot near the Quality Inn.  The record reflects that the police used that information to obtain surveillance video from the Quality Inn.  That video showed defendant going into and coming out of a room while he was limping.  The police also found a shell casing and blood stains in the room at the Quality Inn.  That evidence is not being suppressed.

Affirmed in part, reversed in part, and remanded for further proceedings.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17